**HANSON TRUST PLC, HSCM Industries Inc., Hanson Holdings Netherlands B.V., and HMAC Investments Inc. directly on behalf of themselves as shareholders of SCM Corporation, and derivatively on behalf of SCM Corporation, Plaintiffs,**

**v.**

**SCM CORPORATION, Paul H. Elicker, D. George Harris, Robert O. Bass, Robert B. Bauman, John T. Booth, George E. Hall, Crocker Nevin, Charles W. Parry, Thomas G. Pownall, E. Everett Smith, David W. Wallace, Richard R. West, Manufacturers Hanover Trust Company, ML SCM Acquisition Inc., ML L.B.O. Holdings Inc., Merrill Lynch Capital Markets, Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Defendants.**

Nos. 85 Civ. 7433 (SWK), 85 Civ. 7971 (SWK) and 85 Civ. 8095 (SWK).

United States District Court, S.D. New York.

Nov. 26, 1985.

Weil Gotschal & Manges, Shea & Gould, New York City by Dennis J. Block, Milton Gould, for plaintiffs.

Wachtell Lipton Rosen & Katz, Shearson & Sterling, New York City by Bernard W. Nussbaum, Jeremy G. Epstein, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

### I. *Introduction*

This is a case in which each of the relevant actors asserts that it is truly concerned with furthering the interests of a takeover target's shareholders. The hostile tender offeror argues that it is con-

cerned with giving the target's shareholders the highest price for their equity. The "white-knight" argues that it has secured, for its own benefit, a lock-up option for two of the target's most valuable divisions in order to create additional value for the target's shareholders. For their part, the senior members of the target's management, some of whom may be equity participants in the surviving entity of a leveraged buy-out transaction, argue that they were also concerned with securing the greatest value for the target's shareholders. Similarly, the financial and legal advisors on all sides, who have already received or will receive substantial fees, assert that they too acted to secure the highest value for the target's shareholders. Finally, members of the target's board of directors, who authorized the payment of enormous fees and granted certain lock-up options, assert that they acted to secure the highest possible price for the target's shareholders. Apparently, the target's shareholders disagree with at least some of the foregoing.[1] Some would consider this scenario to be the free market place and the forces of competition operating at their best; others take serious issue with this state of affairs.

The current state of affairs, and the appropriate role for this Court to play in the instant drama, was recently aptly summarized by the Second Circuit, which stated:

Contests for corporate control have become ever more frequent phenomena on the American business scene. Waged with the intensity of military campaigns and the weaponry of seemingly bottomless bankrolls, these battles determine the destinies of large and small corporations alike. Elaborate strategies and ingenious tactics have been developed both to facilitate takeover attempts and to defend against them. Skirmishes are fought in company boardrooms, in shareholders' meetings, and with increasing regularity, in the courts.

The efforts of targeted management to resist acquisitive moves, and the means

1. An SCM shareholder has commenced a shareholder's derivative suit. That suit, *Weiss v.* *SCM,* No. 85 Civ. 7569, is currently pending before Judge Keenan of this Court.

they employ, have been alternatively praised and damned. Proponents of corporate "free trade" argue that defensive techniques permit managers to entrench themselves and thus avoid accountability for their performance, at the expense of shareholders who are denied the opportunity to maximize their investment in sought-after corporations. Opponents contend that takeover struggles squander enormous capital resources which could better be spent to improve industrial productivity and to develop and commercialize new technologies.

When these battles for corporate dominance spawn legal controversies, the judicial role is neither to displace the judgment of the participants nor to predetermine the outcome. Rather, the responsibility of the court is to insure that rules designed to safeguard the fairness of the takeover process be enforced. Our most important duty is to protect the fundamental structure of corporate governance. While the day-to-day affairs of a company are to be managed by its officers under the supervision of directors, decisions affecting a corporation's ultimate destiny are for the shareholders to make in accordance with democratic procedures.

*Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 258 (2d Cir.1984) (footnotes omitted).

Amid the unfolding drama outlined above, plaintiffs in the instant consolidated actions seek a preliminary injunction pursuant to Fed.R.Civ.P. 65(a).[2] The following

constitutes the Court's findings of fact and conclusions of law.[3]

## II. *Findings of Fact*

### A. *The Actors*

Hanson Trust PLC is a corporation organized under the laws of the United Kingdom. HSCM Industries Inc. is a Delaware corporation and an indirect wholly owned subsidiary of Hanson Trust PLC. Hanson Holdings Netherland, B.V. is a limited liability company incorporated under the laws of the Kingdom of the Netherlands, and is an indirect wholly owned subsidiary of Hanson Trust PLC. HMAC Investments Inc. is also a Delaware corporation and is a wholly owned subsidiary of Hanson Trust PLC. Hanson Trust PLC, HSCM Industries Inc., Hanson Holdings Netherlands B.V. and HMAC Investments Inc. (hereinafter collectively referred to as "Hanson") are the plaintiffs in three separate actions which have been consolidated for the purposes of the instant preliminary injunction motion.[4]

Hanson filed its initial complaint on September 20, 1985.[5] That complaint named SCM Corporation ("SCM") and its twelve directors as defendants. Subsequently, Hanson commenced a second action against Manufacturers Hanover Trust Company ("Manufacturers Hanover"). Manufacturers Hanover is the escrow agent for certain agreements to which SCM is a party. Hanson commenced a third action against various entities which are all related to Merrill Lynch, Pierce, Fenner & Smith Incorporated in some manner. These entities are

---

**2.** The parties to the instant actions have, in effect, stipulated to maintain the status quo while the Court considered plaintiff's preliminary injunction motion. They have also stipulated to maintain the status quo in all respects for a period of time beyond the date of this opinion so that the unsuccessful litigant can seek relief in the Court of Appeals.

**3.** The Court's findings of fact and conclusions of law are based upon an evidentiary hearing which continued for eight days, as well as the exhibits submitted by the parties and their moving papers. The parties have been given great latitude to present their positions with supporting material to the Court.

**4.** As the caption of this opinion reflects, the three actions have been consolidated for pre-trial purposes and for purposes of this preliminary injunction motion.

**5.** This is the initial complaint in the instant three consolidated actions. This Court currently has two additional (earlier filed) actions arising from this takeover battle: *Hanson v. SCM,* 85 Civ. 6632 (SWK) and *Hanson v. SCM,* 85 Civ. 6667 (SWK). The latter two actions are not before the Court in the context of the instant preliminary injunction motion.

hereinafter collectively referred to as "Merrill Lynch". The Prudential Insurance Company of America was Merrill Lynch's partner in the LBO offers made to SCM, and in certain "lock-up" options granted to Merrill Lynch.

In its initial complaint, Hanson alleged that SCM and its twelve directors had committed several violations of the federal securities laws, and that the directors had breached their fiduciary duties to SCM and SCM shareholders. This complaint also alleged that the SCM directors had committed a "waste" of corporate assets. In addition, the complaint alleged violations of N.Y.Bus.Corp.Law §§ 717, 720 and 909. Hanson alleges that Merrill Lynch aided and abetted SCM and its directors in the foregoing violations of law, and that Merrill Lynch conspired with SCM and its directors to commit the foregoing violations. As for Manufacturers Hanover, Hanson seeks to enjoin it from executing various allegedly unlawful escrow agreements for which it is the escrow agent.

### B. *The Competing Offers*

The instant dispute arises out of a battle for control of SCM between Hanson and Merrill Lynch. On August 21, 1985, Hanson announced that it would commence an all cash tender offer for any and all shares of SCM's common stock. This offer was for any and all shares of SCM's common stock at a price of $60.00 per share.

On September 3, 1985, the SCM Board of Directors and Merrill Lynch reached a merger agreement. This agreement provided for Merrill Lynch to acquire SCM through a leveraged buy-out ("LBO") transaction. This agreement provided, inter alia, that Merrill Lynch would make a cash tender offer for up to 85.7 percent (10,500,000 shares) of SCM's common stock at a price of $70.00 per share. This tender offer would be followed by a merger in which each share of the remaining 14.3 percent of SCM's common stock would be exchanged for a high risk, high yield "junk bond" valued at $70.00. This agreement provided for the payment of certain fees to

Merrill Lynch and also contemplated participation by some members of SCM's management in the surviving LBO company. The current SCM management could ultimately own up to 15 percent of the surviving LBO company. This agreement was contingent upon Merrill Lynch acquiring at least 66⅔ percent (8,254,000 shares) of SCM's common stock through the tender offer. The SCM board recommended to the shareholders that they accept this offer.

In response to this agreement, Hanson announced, on September 3, 1985, that it would raise the price of its tender offer to $72.00 per share. This $72.00 offer was an all cash offer for any and all shares of SCM's common stock. The $72.00 offer was contingent upon SCM not granting any "lock-up" options to any other party. Neither Hanson's $60.00 offer nor its $72.00 offer were conditioned on a minimum number of shares being tendered.

In response to Hanson's $72.00 offer, Merrill Lynch made a new offer to SCM. This offer, which was unanimously accepted and approved by nine of SCM's directors (three directors abstained) on September 10, 1985, was also an LBO in which SCM management would participate on the same terms as in the $70.00 LBO offer. Merrill Lynch would commence a cash tender offer for up to 80 percent of SCM's common stock at a cash price of $74.00 per share. This would be followed by a merger in which each remaining share of SCM's common stock would be exchanged for a high risk, high yield "junk bond" valued at $74.00. This tender offer was also contingent on Merrill Lynch acquiring a minimum of 8,254,000 shares of SCM's common stock. This figure represents 66⅔ percent of SCM's common stock on a fully diluted basis. The SCM board recommended to the shareholders that they accept this offer. This agreement also granted to Merrill Lynch certain lock-up options. The options permitted Merrill Lynch to purchase SCM's pigments business at a price of $350,000,-000.00 and SCM's Durkee Famous Foods business (also known as the consumer

foods business) at a price of $80,000,000.00 if a certain triggering event occurred. The right to exercise the option would be triggered if any person or group, other than Merrill Lynch, acquired more than one-third of SCM's common stock.

In response to this agreement Hanson announced, on October 8, 1985, that it would increase its tender offer to $75.00, all cash, for any and all shares of SCM's common stock. This offer was not contingent upon the tender of a minimum number of shares, but was contingent upon the termination or injunction of the lock-up options granted to Merrill Lynch.

On October 10, 1985, the SCM Board of Directors approved an exchange offer or "self-tender" offer. This offer provides that each share of SCM common stock could be exchanged for $10.00 in cash and one share of a new series of SCM preferred stock with an effective stated value of $64.00. This offer is for up to two-thirds, or 8,254,000 shares, of SCM's common stock, and is not conditioned on the tender of a minimum number of shares. It is undisputed, and the Court so finds, that this offer was made in an attempt to protect SCM shareholders in the event that neither Merrill Lynch's $74.00 tender offer nor Hanson's $75.00 tender offer is successful.

## C. *Additional Findings of Fact*

SCM's Board of Directors (hereinafter referred to as "the board") consists of twelve members. Three members of the board, Messrs. Elicker, Hall, and Harris, are also senior members of SCM's management. Elicker is the chairman of the board and SCM's chief executive officer. Harris is SCM's president and chief operating officer. Hall is a senior vice president of SCM. The remaining nine members of SCM's board are independent directors. None of them hold a position in SCM's management and none own significant amounts of SCM common stock. Moreover, these nine directors receive no remuneration from SCM other than standard director's fees, and none of these nine directors, including Mr.

West, are affiliated with any entity which does business with SCM. Mr. West's position as an independent director for certain mutual funds managed by Merrill Lynch did not present any conflict of interest for him in his position as an SCM director. These nine directors, Messrs. Booth, Nevin, West, Bass, Bauman, Parry, Pownall, Smith and Wallace, are hereinafter collectively referred to as the "outside" or "independent" directors.

Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") served as the legal advisor to SCM and the SCM board. Goldman Sachs, an investment banking firm, served as the financial advisor to SCM and the SCM board. Both Wachtell Lipton and Goldman Sachs had previously represented SCM. SCM's board approved of Wachtell Lipton and Goldman Sachs as its advisors in the present matter at a board meeting held on August 25, 1985. At all relevant times during the events of the instant battle for control of SCM, Wachtell Lipton and Goldman Sachs represented SCM and the SCM board. Wachtell Lipton and Goldman Sachs did not represent SCM's management in any manner during the relevant time of this dispute.

Neither the nine independent directors nor Wachtell Lipton and Goldman Sachs were dominated or improperly influenced by SCM's management. Likewise, none of the independent directors had any conflict of interest with their fiduciary obligations during any of the relevant negotiations or in any of the approved merger agreements with Merrill Lynch. The same is true for Wachtell Lipton and Goldman Sachs.

Martin Lipton of Wachtell Lipton advised SCM's board about the business judgment rule and a director's fiduciary obligations at the August 25, 1985 board meeting. Moreover, Wachtell Lipton and Goldman Sachs advised the SCM board extensively from August 25, 1985 to the present. This advice included presentations made at SCM board meetings which were held on August 25, August 30, September 3 and September 10, 1985. Each of these meetings was attended by all twelve board members except

for the September 3 meeting. Two independent directors were not present and did not participate in this meeting.[6]

The nine independent directors relied, at least in part, on the advice of Wachtell Lipton and Goldman Sachs throughout this contest for control of SCM. The independent directors also relied on their financial and legal advisors to negotiate with Merrill Lynch. Each of the nine independent directors had extensive business experience as well as a thorough working knowledge of SCM, its operations and its financial condition.

At the August 25 board meeting, the directors concluded that Hanson's $60.00 price was inadequate and resolved to find a superior alternative. The board, Wachtell Lipton, and Goldman Sachs agreed on a strategy which involved seeking either a "white knight" to make a competing, but superior tender offer, or to find a superior leveraged buy-out offer. The board, Wachtell Lipton, and Goldman Sachs also agreed on a strategy which involved refraining from any direct negotiations with Hanson. The board decided on this strategy so that potential superior competing bids would not be "scared off." At all times the independent directors acted with a motivation to secure offers for SCM which would be superior to Hanson's offers. The independent directors at no time acted to "entrench" either themselves or SCM's management.

After the August 25 meeting, Goldman Sachs attempted to find a "white knight" and/or an LBO group. The only concrete offer Goldman Sachs was able to generate was the $70.00 Merrill Lynch offer.

Goldman Sachs' efforts on behalf of SCM led to the $70.00 Merrill Lynch LBO merger agreement. This agreement was unanimously authorized by SCM's independent directors on August 30 and unanimously approved by the seven independent directors who were present at the September 3 meeting. *See* footnote 6. The three

management directors did not participate either in authorizing or approving the $70.00 LBO merger agreement. The management directors were absent during the portion of the meeting when the independent directors approved the $70.00 LBO. Moreover, in negotiating the $70.00 LBO, the board's advisors, Goldman Sachs and Wachtell Lipton, specifically refused to grant to Merrill Lynch any lock-up options for assets or SCM common stock.

The result of the $70.00 offer was Hanson's $72.00 offer. Hanson's $72.00 offer would not have been forthcoming without the Merrill Lynch $70.00 offer.

After Hanson's $72.00 offer, Wachtell Lipton and Goldman Sachs resumed negotiations on behalf of SCM with Merrill Lynch. The board, Goldman Sachs and Wachtell Lipton continued their strategy of not negotiating directly with Hanson. They did not want to "scare off" a superior competing offer by creating the appearance of using Merrill Lynch as a "stalking horse."

On September 10, 1985, the nine independent directors unanimously approved a $74.00 LBO merger agreement with Merrill Lynch. The independent directors also approved lock-up options which granted to Merrill Lynch the right to purchase SCM's pigments and consumer foods businesses. SCM's pigments business was a "core business" for SCM. These two businesses had previously generated approximately 50 percent of SCM's earnings.

In approving the $74.00 LBO and granting the lock-up options the independent directors relied, in part, on the advice of Wachtell Lipton and Goldman Sachs. They also relied on their own business experience and their knowledge of SCM's operations and financial condition. The $74.00 LBO, the lock-up options and the price of the optioned assets were the result of arm's length negotiations between Goldman Sachs and Merrill Lynch. Moreover,

---

6. One of the independent directors, Mr. Nevin, was engaged in a sailing trip. Tr. at 550. When first questioned, Nevin could not recall whether he was at the September 3 meeting. Upon reflection, he was able to recall that he was sailing on September 3. *Id.*

on September 10, Goldman Sachs, Wachtell Lipton, and Merrill Lynch each advised the independent directors that Merrill Lynch would not offer the $74.00 LBO without the lock-up options. Goldman Sachs further advised the independent directors that the prices for the optioned assets were "fair" and that a higher price might be secured if there was more time to seek other buyers for these two assets. Goldman Sachs did not define the range of fair values for the optioned assets, nor did it offer a fair value or range of fair values for SCM as a whole.

The independent directors approved the lock-up options even though there was no consideration for these options other than the potential additional value the $74.00 LBO offer created for SCM's shareholders. They approved the lock-up options after concluding that they could not secure the $74.00 LBO offer without the options.

There has been a considerable dispute among the parties as to whether the trigger event for the lock-up options has been met. First, the Court concludes that this is an issue which it must resolve before it can decide Hanson's preliminary injunction motion. Second, the Court concludes, based on the entire record before it, that the options are triggered when a party or group, other than Merrill Lynch, acquires more than one-third of SCM's outstanding common stock. That is, the options are triggered on a primary basis, and not on a fully-diluted basis as Hanson contends. Thus, Hanson triggered the options as a result of purchases of SCM stock which it completed on September 11, 1985. The language of the asset-option agreement supports this conclusion. Moreover, all of the witnesses from SCM, Merrill Lynch and Goldman Sachs testified to that effect. Hanson has simply failed to adduce sufficient credible proof to refute this conclusion. Thus, because of Hanson's failure to adduce sufficient credible proof on this issue the Court is constrained to conclude, on the basis of the record before it, that the lock-up options are triggered when any party or group (other than Merrill Lynch) acquires more than one-third of SCM's outstanding common stock. Accordingly, the trigger condition has been satisfied.

The Court also concludes that Hanson's $75.00 offer would not have been forthcoming without Merrill Lynch's $74.00 offer. Moreover, in approving the $74.00 LBO and the lock-up options, the independent directors were aware that they would no longer continue to serve on SCM's board, regardless of who prevailed in the contest between Hanson and Merrill Lynch. They were also aware that they would have no role in the optioned businesses if Merrill Lynch successfully purchased them pursuant to the lock-up agreement. The independent directors were aware that some members of SCM's management would participate in the LBO company which would emerge if Merrill Lynch's $74.00 offer was successful. The independent directors were also aware that members of SCM's management would be invited to participate in the LBO company as equity holders. There is no evidence, however, to suggest that the independent directors approved the $74.00 LBO offer in order to entrench SCM's management, nor indeed even to secure management's participation in the LBO. The independent directors approved the $74.00 offer and the lock-up options in an attempt to secure additional value for SCM shareholders.

The record also demonstrates, however, that the independent directors did not give extensive consideration to whether, as of September 10, 1985, any party had already triggered the lock-up options. Nor did the independent directors extensively scrutinize whether the additional value created by the $74.00 LBO offer justified granting the lock-up options with the possible result that, if exercised, SCM would be a company without two of its most significant businesses. The independent directors apparently concluded that the $74.00 offer created additional value which justified the risks concomitant with the lock-up options, including the risk of not knowing how close to the trigger event Hanson or any other third party was. As the Court will explain in its conclusions of law, the current state

of the law apparently permits the directors to do this and precludes this Court from second-guessing or modifying their conduct.

In conclusion, the Court finds that prior to Hanson's $60.00 offer Elicker had discussions with parties other than Merrill Lynch about a possible leveraged buy-out of SCM in which Elicker and other members of SCM management might participate as equity holders. This fact, however, in no way affected the independent directors' decision to approve the $74.00 LBO offer and grant the lock-up options. The Court also concludes that in granting the lock-up options the independent directors knew or should have known that the bidding for SCM would come to an end. Hanson, the only other interested bidder, had specifically conditioned its $72.00 offer on no lock-up options being granted. It was highly unlikely, therefore, that Hanson would top the $74.00 offer without the same condition. The foregoing constitutes this Court's findings of fact.[7]

## III. *Conclusions of Law*

The following constitutes the Court's conclusions of law. Hanson seeks a preliminary injunction to prevent the defendants from executing certain lock-up option agreements. Specifically, Hanson seeks to prevent Merrill Lynch from acquiring SCM's pigments and consumer foods businesses through the asset-option (lock-up option) agreement.[8] Hanson seeks this relief in its dual role as an SCM shareholder and as a competing tender offeror seeking to acquire control of SCM.

In order to obtain a preliminary injunction Hanson must meet the following standard:

Preliminary injunctive relief in this Circuit calls for a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir.1979) (citations omitted). The Second Circuit has recently reaffirmed the extraordinary and drastic nature of this remedy, particularly in the context of a takeover battle. The Court noted:

... the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, *Medical Soc. of State of N.Y. v. Toia*, 560 F.2d 535, 537 (2d Cir.1977) ("an extraordinary and drastic remedy which should not be routinely granted"), must be used with great care, lest the forces of the free market place, which in the end should determine the merits of takeover disputes, are nullified.

*Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985), *petition for reh'g en banc filed*, (2d Cir. October 11, 1985) (No. 85–7745).

In order to obtain a preliminary injunction, Hanson must demonstrate either a likelihood of success on the merits or a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in its favor on at least one of the many claims in its complaint.[9] For the reasons which follow, the Court concludes that Hanson has failed to make the required showing.

In order to obtain the injunction it seeks, Hanson must demonstrate a likelihood of

---

7. These findings of fact are based in large part on the testimony which the Court heard during eight days of hearings. During this time the Court had an opportunity to view and assess the credibility and demeanor of all of the witnesses who testified.

8. Hanson also challenges the payment of a $9,000,000.00 fee to Merrill Lynch. It does not seek an injunction with regard to this fee at this

point because Merrill Lynch has already received this fee. Even if Hanson were to seek to enjoin this fee, such a motion would be denied as moot because Merrill Lynch has already received the $9,000,000.00 fee.

9. The Court will not address the issue of irreparable harm because it concludes that Hanson has failed to satisfy the second prong of the preliminary injunction test.

success on the merits or the existence of a sufficiently serious question going to the merits of its claim that SCM's board breached its fiduciary duty to SCM and SCM shareholders by entering into the lock-up option agreement.[10] A careful review of the current state of the law in this area compels the conclusion that Hanson has failed to make the requisite showing under either prong of the preliminary injunction standard.

The Second Circuit recently explained a board member's obligations as follows:

A board member's obligation to a corporation and its shareholders has two prongs, generally characterized as the duty of care and the duty of loyalty. The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances. *See* NYBCL § 717. In evaluating a manager's compliance with the duty of care, New York courts adhere to the business judgment rule, which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."

The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship. Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders. *See* NYBCL § 713(a)(3).

*Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir.1984) (citations omitted).[11]

The Court also observed that the business judgment rule gives directors wide latitude to resist unfriendly advances and applies unless the directors are shown to have acted out of self-interest in some manner. *Norlin* at 264–265. Even where the business judgment rule applies, however, the board is required "to analyze carefully any perceived threat to the corporation, and to act appropriately when it decides that the interests of the company and its shareholders might be jeopardized." *Id.* at 266. When the actions of SCM's directors in granting the lock-up options are measured against the foregoing, it is clear that Hanson is not entitled to the injunction it seeks.

The Court's findings of fact indicate that the nine independent directors did not grant the lock-up options (or indeed take any action) out of self-interest, or bad faith, or fraud, or for any other improper purpose (such as attempting to entrench themselves or SCM's management in control). The three management directors did not vote on, and did not unduly influence the remaining directors in approving, either the Merrill Lynch $70.00 offer or the $74.00 offer and the lock-up options. The independent directors were precisely that: independent. They had no position in SCM's management, they did not own significant amounts of SCM stock; they received no significant remuneration from SCM and they had no other meaningful business contact with SCM. Moreover, the independent directors did not act to perpetuate their positions on the SCM board, nor did they attempt to perpetuate the position of current SCM management. Thus, there has

---

**10.** Hanson alleges several causes of action in its three complaints. As the hearing progressed, however, it was clear that for purposes of the preliminary injunction motion Hanson was relying upon its claim that the directors breached their fiduciary duty. In any event, Hanson has failed to show a likelihood of success on the merits or a sufficiently serious question going to the merits of any of its other claims, including its claim of waste of corporate assets.

**11.** Although the parties failed to brief the specific issue they apparently assumed that the Court would apply New York law. In any event, the Court concludes that because SCM is incorporated under New York law and has its principal place of business in New York, the correct law to be applied is the New York corporate fiduciary law. The relevant statutory law is codified in N.Y.Bus.Corp.Law §§ 717, 720 and 909.

been no showing that the independent directors breached their duty of loyalty to SCM and its shareholders in any manner. Accordingly, the burden of proof to prove the fairness of the challenged transactions has not shifted to the SCM board.

Similarly, there has been no showing that the board breached its duty of care. The board retained financial and legal advisors. Those advisors served the SCM board and did not act on behalf of SCM's management. There has been no showing of any impropriety in the relationship between the board and its financial and legal advisors, nor has there been any showing that the independent directors acted improperly in relying upon the advice of Goldman Sachs and Wachtell Lipton. In short, the nine disinterested directors exercised independent judgment. They were entitled to engage these advisors and to rely upon the advice of their independent legal and financial advisors. *See Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 384 (2d Cir.1980).

The independent directors granted the lock-up option to secure a $74.00 offer from Merrill Lynch. Thus, the option was granted to secure additional value for the SCM shareholders. This was entirely consistent with the directors' duty of care, even if the lock-up option served to end the bidding for SCM. The granting of the option was not motivated by a desire on the part of the independent directors to end the bidding for SCM. Hanson's $75.00 offer would not have been forthcoming without the $74.00 offer. The independent directors were advised by Merrill Lynch, Wachtell Lipton, and Goldman Sachs that they could not obtain the $74.00 offer without the lock-up option. Moreover, the board had previously refused to grant lock-up options in securing the Merrill Lynch $70.00 offer. This supports the conclusion that the board did not act out of a desire to end the bidding for SCM.

■ Granting lock-up options is not a *per se* violation of a board's fiduciary obligation. *See Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757 (2d Cir.), *cert. denied,*

464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983). Indeed, all of the factors found to exist by the district court in that case exist in the instant case as well. *See Id.* at 759. Moreover, the Second Circuit noted:

> ... it would have been a mistake for the district court to substitute its judgment for the business judgment of the directors, the exercise of which brought about an increase in Ampco's tender offer from $25.00 a share to $37.50 a share.

*Id.* (citations omitted). *See also Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 701–702 (2d Cir.1980). The foregoing applies with equal vigor to the instant case.

In its moving papers, and at the evidentiary hearing, Hanson attempted to challenge the lock-up option, in part, on the ground that the option prices were far below the fair value of the optioned assets. Indeed, the Court heard extensive, albeit conflicting testimony on this point. Questions involving valuation of particular segments of large companies are precisely the type of questions into which the business judgment rule is designed to preclude courts from inquiring. Courts cannot become mired in valuation issues and should not second-guess directors' decisions on such issues absent a strong showing that the directors' somehow breached their fiduciary duties.

No such showing has been made in the instant case. The board's financial advisors indicated that the asset prices were fair. Goldman Sachs informed the board that no pigments business had ever been sold for a price in excess of $1,000.00 per ton of capacity. Goldman Sachs also discussed the price-earnings ratio for the consumer foods business. Goldman Sachs discussed the book-value of these assets and the earnings of these divisions. Moreover, Goldman Sachs stated that a higher price could possibly be obtained for them if more time existed to seek alternative buyers. Goldman Sachs negotiated in good faith and at arm's length with Merrill Lynch over the asset prices and whether a lock-up should even be granted. In view of the current state of the law, the Court sees no

basis upon which it can or should second-guess the independent business judgment of the independent directors on this point.

Hanson further argues that the board hastily gave away the two optioned assets. This argument ignores the realities of a heated takeover battle. The directors did not have the luxury of unlimited time; unlimited time either to consider the Merrill Lynch $74.00 offer or to find an alternative buyer for the two optioned assets. *See Joy v. North,* 692 F.2d 880, 886 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983) (... business imperatives often call for quick decisions).

Hanson also argues that Merrill Lynch and The Prudential Insurance Company of America ("Prudential") "stole" these assets, and "stole" them for nothing. This argument is flawed in two respects. Whether Merrill Lynch thought it was making a profitable deal is irrelevant in determining whether SCM's board acted improperly. Moreover, neither Merrill Lynch nor Prudential owe a fiduciary duty to SCM and its shareholders.

Hanson challenges SCM's decision not to negotiate directly with it. The directors were entitled to utilize this strategy particularly where there was concern about "scaring off" superior competing bids.

■ In view of the foregoing, the Court concludes that Hanson has failed to show a likelihood of success on the merits or a sufficiently serious question going to the merits of its claim that the SCM board breached its fiduciary obligation. This conclusion is by no means intended to convey the impression that this Court condones or approves of the actions taken by SCM's board in granting the lock-up options. Rather, the Court simply concludes that the business judgment rule insulates the directors' actions from intrusion by this Court. There are several aspects of the independent directors' actions which trouble the Court, but these actions do not rise to the level of a breach of the board's fiduciary obligation as the law currently defines it.

The board appears to have given little or no consideration to whether the trigger event for the lock-up option was already satisfied when the option was granted, or how quickly thereafter it might be satisfied. As it turns out, Hanson triggered the lock-up option on September 11, 1985—one day after it was granted. Similarly, the board appears not to have carefully and closely scrutinized the actual superiority of the $74.00 offer (which involved a cash purchase for up to 80 percent of SCM's common stock with the remaining 20 percent being exchanged for "junk bonds"), particularly when coupled with the risk that if the option was triggered and exercised, SCM would be a company without two of its most valuable divisions. The board also failed to read and review *carefully* Merrill Lynch's offers, Hanson's various offers, and the lock-up option agreement. They relied instead primarily on their advisors' description of the terms of these agreements and offers. Finally, the board accepted Goldman Sachs' conclusion that the prices of the optioned assets were fair without ever inquiring about the range of fair values. The foregoing is not condoned by this Court. Rather, based on the record before this Court and the current state of the law, these actions do not rise to the level of a breach of the fiduciary obligation owed to SCM and its shareholders by the board.

Hanson also challenges the payment of certain fees to Merrill Lynch. Of particular concern to Hanson is the so-called $9,000,000.00 "good-bye" or "break-up" fee and the $6,000,000.00 "hello-again fee." Such fees are not unusual in transactions of this type. *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 501 A.2d 1239 (Del.Ch.1985), *aff'd, Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* No. 353 & 354, 1985, slip op. (Del. November 1, 1985) (hereinafter cited as "Revlon").

Hanson attempts to rely on *Revlon* to support its position in the instant case. *Revlon* is distinguishable in several significant respects, however. First, the Revlon board was not disinterested. It was com-

posed of 14 members, six of whom held "prominent positions in Revlon's management", two of whom held significant blocks of Revlon's stock, with most of the remaining non-management directors having an association with entities which did business with Revlon. *Id.* at 1243, n. 2. Second, in *Revlon* the hostile tender offeror (Pantry Pride, Inc.) had clearly stated that it intended to top every offer which the "white knight" (Forstmann Little & Co.) would make. *Id.* at 1245–1246. Third, the Court in *Revlon* noted that the price for the optioned asset was $75,000,000.00 below the lowest fair value placed upon it by Revlon's own investment banker (Goldman Sachs). *Id.* at 1249. Finally, the court concluded that the Revlon board acted to protect the interests of Revlon's note or debtholders instead of the shareholders. *Id.* at 1249–1250. Thus, *Revlon* is significantly distinguishable to render it inapplicable to the instant case.

## IV. *Conclusion*

Based on the foregoing findings of fact and conclusions of law Hanson's motion for a preliminary injunction is *denied.* Hanson has challenged, albeit unsuccessfully, the phenomena of the management leveraged buy-out, "crown jewel" lock-up options, and a transaction where both are combined in an attempt to defeat a hostile tender offer. The current state of the law relating to a board's fiduciary obligation and the transfer of corporate control, however, permits a management leveraged buy-out as well as an LBO where management is an equity participant although not the dominant equity participant. This type of transaction poses serious questions about management's conflicting interests and the protection of the shareholders' interests. Hanson raised those questions in the instant case, but ultimately failed to adduce sufficient credible proof on those questions.

Similarly, the use of lock-up options poses problematic questions. Nonetheless, they are not *per se* improper, have frequently been utilized, and have been upheld by courts.

In the instant case, both phenomena were present. To date, this has not occurred frequently. The problematic questions which are posed by a lock-up option standing alone, or by an LBO in which members of management are or may be significant equity participants standing alone, are infused with a synergistic quality when these two phenomena are combined in a single transaction. In the instant case, Hanson simply failed to produce sufficient credible evidence to prove the existence of the dangers potentially inherent in such a transaction. In view of this failure of proof, this Court is unable to issue the injunction Hanson seeks. The current state of the New York Business Corporation Law permits the type of conduct present in the instant case. The federal courts may not modify this law. That is a matter for the New York Legislature and the New York Court of Appeals.

A group of learned commentators recently correctly summarized the current state of the business judgment rule as follows:

In sum, while the reasoning in the cases to date has not been consistent, one important theme seems to be a judicial willingness to uphold reasonable defensive measures which are part of a viable business strategy and which are likely to facilitate a favorable result for shareholders. Courts seem to struggle —and, where appropriate, have not hestiated [sic] to overturn transactions—in circumstances where defensive strategies do not further such a result and/or alter the basic decision-making structure between management and shareholders. Thus, the business judgment rule, though strained by the unique facts and circumstances arising from the exigencies of hostile takeovers, remains the flexible doctrine required by the courts to protect the good faith conduct of directors.

Block, Barton and Radin, *Business Judgment Rule Changes*, New York Law Journal, May 28, 1985, at 25, 31. The instant case is one in which reasonable measures were deployed as part of a viable business

strategy, as the law currently defines those terms. Hanson failed to adduce sufficient credible proof to the contrary. Accordingly, its motion for a preliminary injunction is denied.

SO ORDERED.