781 F.2d 264
 54 USLW 2359, Fed. Sec. L. Rep. P 92,418
 HANSON TRUST PLC, HSCM Industries Inc., Hanson Holdings
Netherlands B.V., and HMAC Investments Inc.,
Plaintiffs-Appellants,
v.
ML SCM ACQUISITION INC., ML L.B.O. Holdings Inc., Merrill
Lynch Capitol Partners, Inc., Merrill Lynch Capitol Markets,
Merrill Lynch & Co., Inc., and Merrill Lynch, Pierce, Fenner
& Smith Incorporated, SCM Corporation, Paul H. Elicker, D.
George Harris, Robert O. Bass, Robert P. Bauman, John T.
Booth, George E. Hall, Crocker Nevin, Charles W. Parry,
Thomas G. Pownall, E. Everett Smith, David W. Wallace, and
Richard R. West, Defendants-Appellees.
 Nos. 693, 726, Dockets 85-7951, 85-7953.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 18, 1985.
Decided Jan. 6, 1986.
 
 Dennis J. Block, New York City, (Nancy E. Barton, Richard L. Levine, Stephen A. Radin, Patricia A. Olah, Weil Gotshal & Manges, New York City, of counsel) and Milton S. Gould, New York City, (Peter C. Neger, Shea & Gould, New York City, of counsel), for Hanson Trust PLC, et al.
 Bernard Nussbaum, New York City (Michael W. Schwartz, Robert B. Mazur, Theodore N. Mirvis, Eric M. Roth, Barbara Robbins, Karen B. Shaer, Wachtell, Lipton, Rosen & Katz, New York City, of counsel) and Bernard J. Nussbaum, Chicago, Ill. (Harold C. Hirshman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., of counsel), for SCM Corporation, et al.
 Jeremy G. Epstein, New York City, (Robert S. Fischler, James P. Bodovitz, Shearman & Sterling, New York City, of counsel), for ML SCM Acquisition Inc., et al.
 Before OAKES, KEARSE, and PIERCE, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 Hanson Trust PLC, HSCM Industries Inc., Hanson Holdings Netherlands B.V., and HMAC Investments Inc. (hereinafter sometimes referred to collectively as "Hanson") appeal from an order, dated November 26, 1985, in the United States District Court for the Southern District of New York, Shirley Wohl Kram, Judge, denying their motion for a preliminary injunction restraining Merrill Lynch, Pierce, Fenner & Smith Incorporated and related entities, including ML SCM Acquisition Inc. (hereinafter "Merrill"), and SCM Corporation (hereinafter "SCM"), and their respective officers, agents and employees, and all persons acting in concert with them, from exercising or seeking to exercise an asset purchase option (hereinafter sometimes referred to as a "lock-up option") pursuant to an Asset Option Agreement and a Merger Agreement between those corporate entities. Under those Agreements, in the event that by March 1, 1986, any third party acquires one third or more of SCM's outstanding common stock or rights to acquire such stock, Merrill would have the right to purchase SCM's Pigments and Consumer Foods Divisions for $350 million and $80 million, respectively. After an eight-day evidentiary hearing, the district court denied Hanson's motion for a preliminary injunction, principally because it found that under New York law approval of the lock-up option by the SCM directors (hereinafter sometimes referred to as the "Board"), and the lock-up option itself, were, in the exercise of business judgment, "part of a viable business strategy, as the law currently defines those terms," and because "Hanson failed to adduce sufficient credible proof to the contrary." Hanson Trust PLC v. SCM Corp., 623 F.Supp. 848, 859-60 (S.D.N.Y.1985) (hereinafter "Op."). We reverse and remand.
 
 BACKGROUND
 
 2
 This is the second suit arising out of an intense struggle for control of a large public corporation, SCM. In the first case, Hanson Trust PLC v. SCM Corp., 774 F.2d 47 (2d Cir.1985)(hereinafter referred to as "Hanson I" ), we held that Hanson's termination of a $72 offer and nearly immediate purchases of several large blocks of stock amounting to approximately twenty-five per cent of the outstanding shares of SCM privately from five sophisticated institutional investors and in one open market transaction did not violate Secs. 14(d)(1) and (6) of the Williams Act, 15 U.S.C. Sec. 78n(d)(1) and (6) and rules promulgated by the Securities and Exchange Commission thereunder. In the present case, the issue presented is whether it was proper under New York law for SCM and Merrill to execute a lock-up option agreement as part of a $74 offer by Merrill for SCM common stock. In Hanson I, Judge Mansfield summarized the "fast-moving bidding contest" as follows: first, a $60 per share cash tender offer by Hanson, for any and all shares of SCM; next, a counter tender offer of $70, part cash and part debenture, by the SCM Board and their "white knight," Merrill Lynch Capital Markets (with underwriting participation by Prudential Insurance Co.), for a "leveraged buyout" (hereinafter sometimes referred to as an "LBO"); then an increase by Hanson to $72 cash, conditioned on SCM not locking up corporate assets; then a revised $74 cash and debenture offer by SCM-Merrill, with "a 'crown jewel' irrevocable lock-up option to Merrill designed to discourage Hanson from seeking control by providing that if any other party (in this case Hanson) should acquire more than one-third of SCM's outstanding shares (66 2/3 being needed under N.Y.Bus.Corp.L. Sec. 903(a)(2) to effectuate a merger) Merrill would have the right to buy SCM's two most profitable businesses" (Pigments and Consumer Foods) at $350 million and $80 million, respectively. Hanson I at 50-51. Hanson, evidently deterred by the option and faced with the $74 LBO offer, terminated its $72 offer, but made the September 11 purchases upheld in Hanson I, and later announced a $75 cash tender offer conditioned on the withdrawal or judicial invalidation of the subject lock-up options. A more detailed account of the relevant background follows.
 
 
 3
 SCM is a New York corporation with its principal place of business in New York City. It consists of several divisions, including Chemicals, Coatings and Resins, Paper Products, Foods, and Typewriters. Pigments, a subdivision of Chemicals, and Consumer Foods, a subdivision of Foods, referred to by Hanson as the "crown jewels" of the SCM Corporation, have generated approximately 50% of SCM's net operating income in recent years. SCM's Board of Directors consists of twelve members. Three directors, Messrs. Elicker, Hall, and Harris, are also members of SCM's management: Elicker is Chairman of the Board and Chief Executive Officer; Harris is SCM's President and Chief Operating Officer; Hall is a Senior Vice President of SCM. The remaining nine members of the board are "outside" or "independent" directors. None of the nine holds a management position in SCM, owns significant amounts of SCM common stock, or receives any remuneration from SCM other than the standard directors' fee. The district court also found that none is affiliated with any entity that does business with SCM and that all of the directors have considerable business experience and working knowledge of SCM and its operations. Op. at 853.
 
 
 4
 Hanson Trust PLC is a corporation organized under the laws of the United Kingdom. HSCM Industries Inc. is a Delaware corporation and an indirectly wholly owned subsidiary of Hanson Trust PLC. Hanson Holdings Netherlands B.V. is a limited liability company incorporated under the laws of the Kingdom of the Netherlands, and is an indirectly wholly owned subsidiary of Hanson Trust PLC. HMAC Investments Inc. is also a Delaware corporation and is a wholly owned subsidiary of Hanson Trust PLC.
 
 
 5
 On August 21, 1985, Hanson announced its intention to make a $60 cash tender offer for any and all shares of SCM common stock. The evidence showed that SCM common stock traded below $50 per share in July 1985, and that between August 1 and August 19, Hanson had purchased over 87,000 shares for between approximately $54 and $56. See Offer to Purchase For Cash Any and All Outstanding Shares of Common Stock of SCM Corporation (Aug. 26, 1985), PX 37 at II-1.[1] On August 22, 1985, the day after the Hanson offer was announced, the price of SCM stock closed on the New York Stock Exchange at 64 1/8.
 
 
 6
 It is not disputed that also on August 22--three days prior to the SCM Board's first meeting regarding Hanson's offer--SCM management met with representatives of the investment banking firm of Goldman Sachs & Co. and the law firm of Wachtell, Lipton, Rosen & Katz to discuss a response to Hanson's bid.[2] Tr. 27, 30; PX 1 at 31-33. Among the alternatives considered in response to Hanson's offer was the possibility of a leveraged buyout that would include SCM management participation. Tr. 1119. By August 23 or 24, SCM management and Goldman Sachs had initiated discussions with the leveraged buyout firms of Kohlberg, Kravis, Roberts & Co. and Merrill Lynch. Tr. 30-33, 51, 1119-21, 1202-03. SCM's Board met on August 25, and approved the retention of Goldman Sachs and Wachtell Lipton on behalf of SCM and the SCM Board. PX 16 at 11.
 
 
 7
 The parties agree that the August 25 Board meeting was called to discuss alternatives to the Hanson offer; that discussions focused principally on finding either another public company to act as a "white knight" or one or more financial institutions to underwrite a leveraged buyout. Willard J. Overlock, Jr., SCM's principal adviser at Goldman Sachs, advised that because SCM was a highly diversified conglomerate, finding another company to act as a "white knight" in time to defeat Hanson was unlikely. Martin Lipton of Wachtell Lipton advised that a leveraged buyout might be the best approach, assuming SCM could find institutional or private investors. The minutes show that the Board delegated to management the responsibility of investigating both options with Goldman Sachs and Wachtell Lipton. During the next five days, Goldman Sachs and SCM management, pursuing the Board's mandate, found that none of over forty companies contacted were willing to act as a "white knight," and that of three LBO firms contacted, by August 30 only Merrill was interested in participating in a leveraged buyout. Meanwhile, Hanson's $60 tender offer had become effective as of August 26, notwithstanding that the market price for SCM shares on that day was in the mid 60's. SCM did not respond to Hanson's overtures for discussions.
 
 
 8
 Following five days of negotiations, SCM management and Goldman Sachs reached an LBO agreement with Merrill, pending approval of the SCM Board. Under the proposal, Merrill, through a corporate shell called ML SCM Acquisition Inc., would make a $70 cash tender offer for up to 10,500,000 SCM shares (approximately 85% of the outstanding shares), to be followed by a second step in which the remaining shareholders would either have to exchange their shares for "high risk, high yield" subordinated debentures (commonly called "junk bonds") priced so as to be valued at $70 per share or resort to their appraisal rights under New York law. N.Y.Bus.Corp.L. Sec. 623. Proportionately, the proposed buyout would be $59.50 per share in cash and $10.50 per share in to-be-newly-issued debentures. SCM management would have the right to purchase up to 15% of the resulting ML SCM Acquisition Inc.
 
 
 9
 Merrill, concerned that it be compensated for its work and that it not become a mere "stalking horse" in the looming battle between Hanson and SCM, insisted on some protective assurances that it would profit for its efforts whether or not they proved fruitful. Although SCM's management would not accede to Merrill's demand for stock options, it granted a $1.5 million engagement fee (the so-called "hello" fee), and a $9 million "break-up" fee (the so-called "goodbye" fee), the latter to be paid to Merrill in the event that any third party should acquire one third or more of the outstanding shares of SCM common stock for $62 or more per share prior to March 1, 1986. The obvious significance of a third party acquiring one third of the shares was that such acquisition would enable that party to "block" the planned merger of tendered shares into the new ML SCM Acquisition entity, since under New York law a merger requires the approval of "two thirds of the outstanding shares entitled to vote." N.Y.Bus.Corp.L. Sec. 903(a)(2).
 
 
 10
 On August 30, the SCM Management-Merrill LBO proposal was presented to the SCM Board via a telephonic conference call meeting. The terms of the proposal were reduced to a two-page Letter Agreement, which was described to the nine independent directors in detail, but which was not available for them to read until after they had unanimously voted to approve it and to authorize SCM management and Merrill to negotiate a definitive merger agreement. The three management directors did not vote. The meeting was conducted from SCM's offices where SCM management, Goldman Sachs and Wachtell Lipton representatives, but not outside directors, were present.
 
 
 11
 The Merger Agreement was negotiated and drafted over Labor Day weekend, and presented to a special meeting of the Board of Directors on September 3. Overlock from Goldman Sachs explained to the Board that the proposal remained the only firm offer to counter Hanson's still-outstanding $60 bid, and delivered Goldman Sach's opinion that Merrill's $70 bid was "fair" to SCM shareholders. Overlock further informed the Board that the $70 debentures would be priced by Goldman Sachs and Merrill (or, if they disagreed, by a third nationally recognized investment banker) to ensure that the debentures would have a market value of $70 per share at the time of their issuance. The SCM Board understood that some SCM officers, as yet unidentified, would participate in the LBO, and would obtain an equity position in the new entity of up to 15 percent. The three management directors, though present at the meeting, did not vote. Again, the nine outside directors unanimously approved the Agreement, which was subsequently publicly announced.
 
 
 12
 In response to this Agreement, on that same day, September 3, Hanson announced that it would raise the price of its tender offer to $72 all cash, for any and all shares of SCM's common stock. Hanson conditioned this new offer on SCM's refraining from "grant[ing] to a person or group proposing to acquire the Company ... any type of option, warrant or right which, in the sole judgment of [Hanson], constitutes a 'lock-up' device ... and ... makes it inadvisable to proceed with the Offer or with such acceptance for payment or payment." Supplement Dated September 5, 1985 to Offer to Purchase Dated August 26, 1985, DX AA at 4. Upon making this offer, Hanson again made unsuccessful overtures to SCM to discuss a "friendly" takeover. Tr. 783-84.
 
 
 13
 On September 6, Merrill and SCM management announced termination of the $70 offer under the broad authority that the Board had given to management to take all "necessary and advisable" actions regarding the offer. Negotiations between Merrill and SCM management for a second LBO-Merger Agreement resumed, and on September 10, the parties prepared a new proposal for the SCM Board. Merrill proposed to make a $74 cash tender offer for a minimum of two-thirds on a fully diluted basis and up to 80 percent (as opposed to the earlier 85%) of SCM's common stock. This would be followed by a second-step merger in which each of the remaining 20% of the shares of SCM common stock would be exchanged for a high risk, high yield debenture, subordinated to other corporate debt and not accruing interest for five years, valued at $74. Given the greater proportion of debenture financing in this offer as compared to Merrill's earlier $70 offer, the effective cash component of the new offer on a proportionate basis was $59.20 per share, or thirty cents less per share than under the $70 offer, and the effective debenture component overall was $14.80 per share, or $4.30 more per share than under the $70 offer. The net result was that under the $74 offer Merrill was not putting up any more cash than it was under the $70 offer.
 
 
 14
 As consideration for this new offer, SCM agreed to place the $9 million break-up fee into an escrow account, payable should a third party acquire one third of SCM stock, paid Merrill an additional $6 million "hello again" fee, and, most importantly, proposed to grant Merrill an option to purchase SCM's Pigments and Consumer Foods businesses.[3] Tr. 1033, 1254. Merrill also sought stock options for 18 1/2% of SCM's stock, but SCM refused that request.
 
 
 15
 Under the proposed asset option provision, Merrill would have the irrevocable right to purchase SCM's Pigments business for $350,000,000, and SCM's Durkee Famous Foods (sometimes referred to herein as "Consumer Foods") for $80,000,000, in the event that a third party acquired more than one third of SCM's common stock.[4] The district court found that Merrill had made clear that it would not proceed without the asset options, and that the lock-up option prices were the product of "arm's length negotiations" between Goldman Sachs and Merrill. Op. at 853. There is evidence that Merrill initially proposed $260 million for Pigments and $65 to 70 million for Consumer Foods; that Goldman Sachs, negotiating on behalf of SCM, counteroffered $400 million for Pigments and $90-95 million for Consumer Foods; and that the parties ultimately settled at $350 million for Pigments and $80 million for Consumer Foods. Tr. 1039-40, 1260-62.
 
 
 16
 On September 10, 1985, at the special meeting of the Board, the nine independent directors for the first time were informed of and considered the new LBO merger agreement and the proposed lock-up options. The meeting began at nine o'clock in the evening, and lasted approximately three hours. Goldman Sachs advised the Board that the $74 offer was the best available, and was fair to SCM shareholders. See Minutes of SCM Board of Directors Meeting (Sept. 10, 1985), PX 27 at 6. This opinion was later confirmed in a formal letter to the SCM Board. Tr. 1060-61. As to the Asset Option Agreement, Overlock advised the Board that the option prices were "within the range of fair value," though he did not inform the Board as to what that range was.[5] Overlock stated that he believed that SCM could obtain a higher price for each business if an orderly sale were conducted. PX 27 at 5-6. He also stated that "the current trading value" of Merrill's $74 offer would be above $72 per share. Id. He testified that, giving effect just to the time value of money, the Merrill $74 LBO was in fact worth $1.25 to $1.50 more per share than the Hanson $72 cash offer, but it would trade at about $72.50 per share. Tr. 1179.
 
 
 17
 The testimony at the evidentiary hearing shows that Goldman Sachs never advised the Board, and the Board never asked, what the fair value of the two businesses was, or what the range of such value was. Tr. 922-25, 932, 1070-71. Further, Goldman Sachs had not calculated such values--and had not informed the Board that it had not made such calculations. Tr. 1071, 1169-70. Nor was there any discussion of the significance for SCM of selling these two businesses, which represent approximately one half of SCM's present and projected operating income. No documents or pro forma financial statements were given out at the meeting, and none were requested. Tr. 910, 1177. None of the directors suggested postponing a decision on the lock-up option. Tr. 920. Nor did the Board suggest contacting Hanson to see if it might top the proposed $74 offer, including the lock-up option. Tr. 1065.
 
 
 18
 Martin Lipton advised the Board that in Wachtell Lipton's opinion, the decision whether to approve the Asset Option Agreement was within the discretion of the Board's business judgment. PX 27 at 7-9. There was evidence that one director asked Merrill's chief negotiator whether Merrill would proceed with its $74 proposal without the lock-up option. The negotiator responded that neither Merrill nor its partner, Prudential, would go forward without the asset option. After the three management directors left the room, SCM's independent directors unanimously approved the Asset Option Agreement. The district court found that the directors "approved the lock-up options after concluding that they could not secure the $74 LBO offer without the options." Op. at 854.
 
 
 19
 In response to Merrill's new proposed tender offer, on September 11 Hanson announced the termination of its $72 all cash tender offer, which had been expressly conditioned upon SCM's not granting a lock-up option. Within hours following this announcement, Hanson purchased approximately twenty-five percent of SCM's common stock in transactions that this court upheld in Hanson I as not constituting a de facto tender offer in violation of the Williams Act. In the present action, the district court found that Hanson's September 11 purchases triggered Merrill's rights to exercise the lock-up option. Op. at 854. Following this court's decision in Hanson I on September 30, Hanson purchased an additional 545,000 shares of SCM stock between October 2 and October 4, bringing its aggregate holdings to some 37.4% on a primary basis and approximately 32.1% on a fully diluted basis.[6]
 
 
 20
 On October 8, after commencing the present suit in district court, Hanson announced its intention to make a $75 cash tender offer for any and all shares of SCM common stock, conditioned on the withdrawal or judicial invalidation of the lock-up option,[7] to commence on October 11. PX 200 at 15. On October 8, Merrill announced that it was exercising the lock-up option and on October 9 it announced that it had withdrawn the $9 million break-up fee from escrow for its own use. On October 10, the SCM Board approved an Exchange Offer whereby if both the Hanson and Merrill offers fail, all SCM shareholders could exchange each SCM share for $10 cash and $64 in a new series of SCM preferred stock. The offer was made for up to 8,254,000 shares, or two thirds of the outstanding shares on a fully diluted basis.
 
 
 21
 In the evidentiary hearings before the district court, the parties presented extensive evidence regarding not only the decision-making process of the SCM directors in approving the lock-up option but also the substantive fairness to SCM shareholders of the option and the option prices. This evidence included testimony by Overlock that, based on acceptable price-earnings ratios applied to Goldman Sachs' own data, the value of Pigments could be substantially higher than the option price agreed to by SCM for Pigments. There was also evidence that the Consumer Foods business was seriously undervalued in the Option Agreement. Notwithstanding the extensive evidence adduced from both sides as to the value of the optioned businesses, the district court declined to make findings regarding such evidence. Hanson appeals from the district court's denial of the motion for a preliminary injunction.
 
 DISCUSSION
 
 22
 In this second phase of litigation in this takeover dispute, we are asked to determine whether SCM's Board of Directors' approval of a lock-up option of substantial corporate assets is protected by the business judgment rule. More specifically, we are to consider whether the district court was correct in holding, as it did, that the appellants did not "make a strong showing that the directors somehow breached their fiduciary duties," Op. at 857, such as to shift to the SCM directors the burden of justifying the fairness of the lock-up option. We believe that the district court erred in holding that Hanson has failed to make a prima facie showing of a breach of a fiduciary duty; we also believe that, once the burden shifted, the extensive evidence presented during the eight-day evidentiary hearing clearly shows that, for preliminary injunction purposes, the appellees did not sustain their burden of justifying the fairness of the lock-up option.
 
 
 23
 * To obtain a preliminary injunction, Hanson faces the formidable task of showing: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 260 (2d Cir.1984); Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co., 604 F.2d 755, 758 (2d Cir.1979).
 
 
 24
 We note at the outset that the district court properly recognized that a preliminary injunction is an extraordinary measure, particularly in a takeover context. As we noted in Hanson I:
 
 
 25
 ... the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, Medical Soc. of State of N.Y. v. Toia, 560 F.2d 535, 537 (2d Cir.1977) ("an extraordinary and drastic remedy which should not be routinely granted"), must be used with great care, lest the forces of the free market, which in the end should determine the merits of takeover disputes, [be] nullified.
 
 
 26
 Hanson I, 774 F.2d at 60.
 
 
 27
 Our standard of review is whether the district court abused its discretion in denying the preliminary injunction, Coca-Cola v. Tropicana Products, Inc., 690 F.2d 312, 315 (2d Cir.1982) (remanding for issuance of preliminary injunction), i.e., whether it "relie[d] on clearly erroneous findings of fact or on an error of law in [not] issuing the injunction," Hanson I, 774 F.2d at 54.
 
 
 28
 SCM is a New York corporation, and no party disputes that the acts of its directors are to be considered in light of New York law. Under New York corporation law, a director's obligation to a corporation and its shareholders includes a duty of care in the execution of directorial responsibilities. Under the duty of care, a director, as a corporate fiduciary, in the discharge of his responsibilities must use at least that degree of diligence that an "ordinarily prudent" person under similar circumstances would use. See N.Y.Bus.Corp.L. Sec. 717. In evaluating this duty, New York courts adhere to the business judgment rule, which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." Auerbach v. Bennett, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 1000 (1979); see also Pollitz v. Wabash R.R. Co., 207 N.Y. 113, 124, 100 N.E. 721, 724 (1912).
 
 
 29
 Thus, in duty of care analysis, a presumption of propriety inures to the benefit of directors; absent a prima facie showing to the contrary, directors enjoy "wide latitude in devising strategies to resist unfriendly [takeover] advances" under the business judgment rule. See Norlin, 744 F.2d at 264-65 (citing Treadway v. Care Corp., 638 F.2d 357, 380-84 (2d Cir.1980); Crouse-Hinds Co. v. Internorth, Inc., 634 F.2d 690, 701-04 (2d Cir.1980)). However, even if a board concludes that a takeover attempt is not in the best interests of the company, it does not hold a blank check to use all possible strategies to forestall the acquisition moves. Norlin, 744 F.2d at 265-66.
 
 
 30
 Although in other jurisdictions, directors may not enjoy the same presumptions per the business judgment rule, at least in a takeover context, see, e.g., Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954-55 (Del.Sup.1985) (initial burden on directors in takeover context to show reasonable grounds for believing that takeover would endanger corporate policy; satisfied by directors' showing good faith and reasonable investigation), under New York law, the initial burden of proving directors' breach of fiduciary duty rests with the plaintiff. See Crouse-Hinds, 634 F.2d at 702; see also Auerbach, 419 N.Y.S.2d at 926-27, 393 N.E.2d at 1000-01.
 
 
 31
 In the present case, the challenged acts of the directors concern the grant of the lock-up option. This takeover defensive tactic is not per se illegal. See, e.g., Buffalo Forge Co. v. Ogden Corp., 717 F.2d 757 (2d.Cir.),cert. denied, 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983) (validating a stock lock-up under the business judgment rule), but it may nonetheless be illegal in particular cases, see e.g., Data Probe, Inc. v. C.R.C. Information Systems, No. 92138-1983 (Sup.Ct.N.Y.Co. Dec. 11, 1984), reprinted in N.Y.L.J. Dec. 28, 1984 at 7, col. 2. See also MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc., 501 A.2d 1239, 1250 (Del.Ch.1985) aff'd, Nos. 353 & 354 (Del.Sup. Nov. 1, 1985) (noting that lock-up options are not per se illegal, but preliminarily enjoining asset option agreement as likely misapplication of directorial authority). Further, in evaluating the acts of SCM's directors in the present case, we remain mindful of our overriding concern in Hanson I that the role of the court in an action to enjoin takeover measures is to allow the forces of the free market to determine the outcome to the greatest extent possible within the bounds of the law. See Hanson I, 774 F.2d at 60. In this regard, we are especially mindful that some lock-up options may be beneficial to the shareholders, such as those that induce a bidder to compete for control of a corporation, while others may be harmful, such as those that effectively preclude bidders from competing with the optionee bidder. See Thompson v. Enstar Corp., Nos. 7641, 7643, at 7-13 (Del.Ch. June 20, 1984), at 7-13 revised, Aug. 16, 1984 (distinguishing options that attract or foreclose competing bids); see also Note, Lock-Up Options: Towards a State Law Standard, 96 Harv.L.Rev. 1068, 1076-82 (1983).
 
 II
 
 32
 Under the circumstances presented in this case, the business judgment doctrine is misapplied when it is extended to provide protection to corporate board members where there is an abundance of evidence strongly suggesting breach of fiduciary duty, as we develop below. See generally, Arsht, The Business Judgment Rule Revisited, 8 Hofstra L.Rev. 93 (1979) (noting limits of business judgment rule).
 
 
 33
 The district court herein found no fraud, no bad faith and no self-dealing by SCM's directors; we do not disagree with these findings. However, the exercise of fiduciary duties by a corporate board member includes more than avoiding fraud, bad faith and self-dealing. Directors must exercise their "honest judgment in the lawful and legitimate furtherance of corporate purposes," Auerbach, 419 N.Y.S.2d at 926, 393 N.E.2d at 1000. It is not enough that directors merely be disinterested and thus not disposed to self-dealing or other indicia of a breach of the duty of loyalty. Directors are also held to a standard of due care. They must meet this standard with "conscientious fairness," Alpert v. 28 Williams St. Corp., 63 N.Y.2d 554, 569, 483 N.Y.S.2d 667, 674, 473 N.E.2d 19, 26 (1984) (citing cases). For example, where their "methodologies and procedures" are "so restricted in scope, so shallow in execution, or otherwise so pro forma or halfhearted as to constitute a pretext or sham," then inquiry into their acts is not shielded by the business judgment rule. Auerbach, 419 N.Y.S.2d at 929, 393 N.E.2d at 1002-03.
 
 
 34
 The law is settled that, particularly where directors make decisions likely to affect shareholder welfare, the duty of due care requires that a director's decision be made on the basis of "reasonable diligence" in gathering and considering material information. In short, a director's decision must be an informed one. See American Law Institute, Principles of Corporate Governance: Analysis and Recommendations Sec. 4.01(c)(2) (Tent.Draft No. 4, April 12, 1985) ("informed with respect to the subject of his business judgment to the extent he reasonably believes to be appropriate under the circumstances"); H. Ballantine, Law of Corporations Sec. 63a at 161 (rev. ed. 1946) ("presupposed that reasonable diligence and care have been exercised"); Arsht, supra, at 111 (business judgment rule should not be available to directors who do "not exercise due care to ascertain the relevant and available facts before voting"). Directors may be liable to shareholders for failing reasonably to obtain material information or to make a reasonable inquiry into material matters. See e.g., Manheim Dairy Co. v. Little Falls Nat. Bank, 54 N.Y.S.2d 345, 365-66 (Sup.Ct.1945), cited in Platt Corp. v. Platt, et al., 42 Misc.2d 640, 249 N.Y.S.2d 1, 6 (Sup.Ct.1964), affd, 23 A.D.2d 823, 258 N.Y.S.2d 629 (1st Dep't.1965), rev'd on other grounds, 17 N.Y.2d 234, 270 N.Y.S.2d 408, 217 N.E.2d 134 (1966). Cf. Beveridge v. New York El. R. Co., 112 N.Y. 1, 22, 19 N.E. 489, 494 (1889) (directors owe to shareholders duties "of the most responsible kind"). Thus, while directors are protected to the extent that their actions evidence their business judgment, such protection assumes that courts must not reflexively decline to consider the content of their "judgment" and the extent of the information on which it is based.
 
 
 35
 The actions of the SCM Board do not rise to that level of gross negligence found in Smith v. Van Gorkom, 488 A.2d 858, 874-78 & n. 19 (Del.Sup.1985). There, in making its decision after only two hours of consideration, the board relied primarily on a twenty-minute presentation by the chief executive officer who had arranged the proposed merger without informing other Board members or management and despite the advice of senior management that the merger price was inadequate. On the other hand, the SCM directors failed to take many of the affirmative directorial steps that underlie the finding of due care in Treadway, supra, on which the district court herein relied. In Treadway, the directors "armed" their bankers with financial questions to evaluate; they requested balance sheets; they adjourned deliberations for one week to consider the requisitioned advice; and they conditioned approval of the deal on the securing of a fairness opinion from their bankers. See Treadway, 638 F.2d at 384. By contrast, the SCM directors, in a three-hour late-night meeting, apparently contented themselves with their financial advisor's conclusory opinion that the option prices were "within the range of fair value," although had the directors inquired, they would have learned that Goldman Sachs had not calculated a range of fairness. There was not even a written opinion from Goldman Sachs as to the value of the two optioned businesses. Tr. 1070. Moreover, the Board never asked what the top value was or why two businesses that generated half of SCM's income were being sold for one third of the total purchase price of the company under the second LBO merger agreement, or what the company would look like if the options were exercised. Tr. 131, 142-44. There was little or no discussion of how likely it was that the option "trigger" would be pulled, or who would make that decision--Merrill, the Board, or management. Also, as was noted in Van Gorkom, the directors can hardly substantiate their claim that Hanson's efforts created an emergency need for a hasty decision, given that Hanson would not acquire shares under the tender offer until September 17. PX 37. The directors manifestly declined to use "time available for obtaining information" that might be critical, given "the importance of the business judgment to be made." See ALI supra Sec. 4.01 at 66. In short, the SCM directors' paucity of information and their swiftness of decision-making strongly suggest a breach of the duty of due care.
 
 
 36
 Nor is SCM's argument that it was entitled to rely on advice of Wachtell Lipton and Goldman Sachs dispositive of Hanson's claim that the SCM directors failed adequately to inform themselves under the duty of care. In general, directors have some oversight obligations to become reasonably familiar with an opinion, report, or other source of advice before becoming entitled to rely on it. In our view, the test of reasonableness should suffice with respect to the area of expertise relied upon, whether that area be legal or financial. See ALI, supra Sec. 4.02 at 76-79. Cf. Harris v. Pearsall, 116 Misc. 366, 384, 190 N.Y.S. 61, 71 (Sup.Ct.1921) (reliance unwarranted); Hawes & Sherrard, Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases, 62 Va.L.Rev. 1, 48-49 (1976); Longstreth, Reliance on Advice of Counsel as a Defense to Securities Law Violations, 37 Bus.Law. 1185, 1190-93 (1982); Small, The Evolving Role of the Director in Corporate Governance, 30 Hastings L.J. 1353, 1359-62, 1382-83 (1979).
 
 
 37
 The district court in the present case notes that the Board failed to read or review carefully the various offers and agreements and instead relied on the advisers' descriptions. In particular, the district court found that at the September 10 Board meeting, the directors accepted Goldman Sachs' conclusion that the prices of the optioned assets were fair, without ever inquiring about the range of fair value. Had the directors so inquired, and had Goldman Sachs revealed that they had not investigated the range of fair value as such, the directors might have then discovered that the prices represented lower valuations than their own experienced business judgment would allow them to approve. The directors did not seek any documents in support of Goldman Sachs' conclusory opinion. Nor would the costs of obtaining documentation have outweighed any conceivable legitimate needs of the directors to conserve time and rely on Goldman Sachs' "conclusion." Cf. ALI, supra Sec. 4.01 at 66 (considering "the costs related to obtaining information"). After all, only one week earlier, Goldman Sachs had compiled an extensive set of financial data, which, while not stating a value or range of values for the Pigments and Consumer Foods businesses, at least offered some quantitative bases for assessing whether the option prices indeed were "within the range of fair value." Given that Hanson would not acquire stock through its $72 tender offer until one week after the September 10 meeting, there was certainly time to consider these data. Moreover, the fact that Overlock opined at the September 10 board meeting that an "orderly sale" could achieve higher prices for Pigments and Consumer Foods should have led the directors to investigate, rather than rely baldly upon, the oral opinion as to fairness. Finally, Goldman Sachs offered no opinion as to what kind of company SCM would be without its "core" businesses. On this issue, of which there is no evidence of any inquiry by the directors, there is thus not even a conclusory opinion from its advisors on which the directors plausibly might have relied.
 
 
 38
 We find unpersuasive SCM's defense that this "working board" was already familiar with SCM, and hence was capable of making the swift decisions that it made. Given this "working board's" considerable familiarity with SCM, we must question why it did not find the option prices troublesome in light of the considerable evidence--from Overlock, its own investment banker, and others, and from valuations made by SCM's management and Merrill--that the optioned assets were worth considerably more than their option prices. Indeed, given that the very purpose of an asset option in a takeover context is to give the optionee a bargain as an incentive to bid and an assured benefit should its bid fail, see Fraidin & Franco, Lock-Up Arrangements, 14 Rev.Sec.Reg. 821, 823, 827 (1981), one again might have expected under such circumstances a heightened duty of care. The price may be low enough to entice a reluctant potential bidder, but no lower than "reasonable pessimism will allow." Cf. Brudney & Chirelstein, Fair Shares in Corporate Mergers and Takeovers, 88 Harv.L.Rev. 297, 298 (1974). To ascertain that management's proposal has not crossed this critical line, the Board certainly should have subjected the proposal to some substantial analysis. Instead, we view the board as only minimally fulfilling, if not abdicating, its role.
 
 
 39
 The proper exercise of due care by a director in informing himself of material information and in overseeing the outside advice on which he might appropriately rely is, of necessity, a pre-condition to performing his ultimate duty of acting in good faith to protect the best interests of the corporation. See Auerbach, 419 N.Y.S.2d at 927, 393 N.E.2d at 1001. Although the SCM independent directors have not been shown to have acted out of self-interest or to have been fraudulent or self-dealing in breach of their duty of loyalty, they do not appear to have pursued adequately their obligation to ensure the shareholders' fundamental right to make the "decisions affecting [the] corporation's ultimate destiny," Norlin, 744 F.2d at 258, as required by their duty of care.
 
 
 40
 In the context of a self-interested management proposing a defensive LBO, the independent directors have an important duty to protect shareholder interests, as it would be unreasonable to expect management, with financial expectancies in an LBO, fully to represent the shareholders. Cf. Longstreth, Fairness of Management Buyouts Needs Evaluation, Legal Times, Oct. 10, 1983, at 15 (noting that independent directors, even without evidencing "wrongdoing, venality or antisocial behavior," may improperly defer to management at the expense of shareholders). See also Cox & Munsinger, Bias in the Boardroom: Psychological Foundations and Legal Implications of Corporate Cohesion, 48 Law & Contemp.Probs. 83 (1985). We do not say that the independent directors of SCM were required to appoint an independent negotiating committee of outside directors to negotiate with Merrill, as the court suggested in Weinberger v. UOP, Inc., 457 A.2d 701, 709 n. 7 (Del.Sup.1983), though that certainly would have constituted one appropriate procedure under the circumstances. But in approving post hoc the LBO negotiated and proposed by management directors with a not insubstantial potential 15% equity interest in the arrangement, the independent directors should have taken at least some of the prophylactic steps that were identified as constituting due care in Treadway, 638 F.2d at 384.
 
 
 41
 SCM's board delegated to management broad authority to work directly with Merrill to structure an LBO proposal, PX 21 at 11; PX 27 at 20-21, and then appears to have swiftly approved management's proposals. Such broad delegations of authority are not uncommon and generally are quite proper as conforming to the way that a Board acts in generating proposals for its own consideration. However, when management has a self-interest in consummating an LBO, standard post hoc review procedures may be insufficient. See Longstreth, supra. Even before the Board first met on August 25, 1985, in reaction to Hanson's offer, Goldman Sachs and Wachtell Lipton, who were later to become the Board's advisers, were already discussing an LBO with management. When Hanson raised its bid to $72, it was SCM's management and these advisers who caucused to develop a response. Even after Wachtell Lipton was formally retained by the Board, there was sufficient confusion for one of Prudential's participants in the negotiations to note in a confidential notebook: "Lipton rep[resentin]g m[ana]g[emen]t." PX 103 at P-003044. It was SCM's management that put the $9 million break-up fee and the optioned assets into escrow accounts over which Merrill apparently exercised unilateral control. SCM's management and the Board's advisers presented the various agreements to the SCM directors more or less as faits accompli, which the Board quite hastily approved. As the district court found, the Board "knew or should have known" that its approval of the Asset Option Agreement would effectively foreclose further bidding for SCM. Op. at 855. The effect was to preclude shareholders from achieving any value higher than that agreed upon by SCM management and Merrill. In short, the Board appears to have failed to ensure that alternative bids were negotiated or scrutinized by those whose only loyalty was to the shareholders.
 
 III
 
 42
 Having determined that the synergies of evidence showing a prima facie case of breach of the duty of care effectively shifted the burden of justification to SCM, we now consider SCM's claims of justification. First, SCM argues that it presented evidence to rebut Hanson's extensive evidence that the option prices were undervalued. A director's obligation to protect the financial interests of the corporation, and thereby the shareholders, see, e.g., Data Probe, No. 92138-1983 at 8, may not be compromised by a competing interest in other legitimate corporate purposes, such as fending off a hostile takeover bid. When engaging in defensive maneuvers, such as a lock-up option, a director's primary obligation is to ensure the overall fairness, including a fair option price, to the shareholders. See Revlon,% 501 A.2d at 1249 (noting differential of $75,000,000.00 between option price and lowest estimate of value in target's investment banker's opinion); cf. Norlin, 744 F.2d at 266 n. 11 (noting lack of cash consideration for defensive stock issuance). Of course, a court need not, and here the district court clearly did not, ascertain "the 'precise value' " of the optioned assets to determine the validity of the lock-up option, at least for preliminary injunction purposes. Cf. Alpert v. 28 Williams St. Corp., 483 N.Y.S.2d at 675, 473 N.E.2d at 27 (analyzing fairness of cash-out merger transaction). The inquiry is not whether the asset option prices represented fair value as a factual matter, but whether SCM met its burden of justifying the fairness of the lock-up option by adducing legally sufficient evidence to render inappropriate the remedy of a preliminary injunction. SCM contends that the sale of Pigments for $350 million would represent the highest price per ton (over $1000 per ton) of industrial capacity for which a Pigments business has ever been sold. Assuming this to be true, the assertion is nonetheless unpersuasive. On cross examination, Overlock of Goldman Sachs was asked whether he had told the board that "tonnage" represented "a lousy way to value [Pigments], but you talked about tonnage, correct?" Overlock answered "Yes, we did." Tr. 1186. Indeed, the minutes of the September 10 board meeting reflect that Overlock told the Board that capacity is "not necessarily the best" benchmark of the value of Pigments. PX 27 at 5-6. The Board does not appear to have posed follow-up questions. Further, Overlock testified, as is surely the case, that "a very significant" measure of the real value of Pigments, as with Consumer Foods, is in the expected earnings of the business, Tr. 1185-86, and it was clear to one and all that Pigments was most likely to continue to bring the most promising and important share of earnings to the corporation. And it is undisputed that in valuing Pigments SCM's litigation analysis looks to only 1985 and 1986 earnings, the two lowest actual and projected earnings years in a ten-year sequence.
 
 
 43
 SCM also points to a document prepared on August 7, 1985 by Rothschild Inc., Hanson's investment bank, which estimated the value of Pigments at $345 million. See SCM Corporation Discussion Notes, PX 73. However, these notes were based on admittedly incomplete data--Rothschild did not then have available the fiscal year-end Form 10-K filed September 27--and were not intended to provide comprehensive or final valuation determinations. In composing the document, Rothschild estimated the value of the Chemicals Division at $490 to $565 million, id. at 11, but its estimation of the value of Pigments quite clearly did not reflect--because Rothschild was not aware of--the fact that Pigments accounted for some 88% of the operating income of the Chemicals Division in 1985, according to testimony by Overlock.[8] Given that the Discussion Notes provide only brief descriptive vignettes of SCM businesses without the year-end 10-K, this oversight is hardly surprising. Rothschild reevaluated its estimate of the value of the Pigments business on the basis of documents, including those of Goldman Sachs, and depositions that became available in the course of this litigation. Noting SCM's high quality Dupont technology, Rothschild valued the titanium dioxide business, which generates 85% or 90% of Pigments' operating income, in excess of $400 million. Adding in the rest of SCM's Pigments business and taking into account the price-earnings multiples, Rothschild valued the total Pigments business at $450 to 500 million.
 
 
 44
 Hanson produced substantial evidence at the eight-day hearing that the optioning of the "crown jewels" demonstrates that the directors failed to meet their duty of inquiry and had an inadequate basis for concluding one way or the other that the prices were "within the range of fair value." First, as to Pigments, optioned at $350 million, Overlock, SCM's own investment banker at Goldman Sachs, testified that, using Goldman Sachs' own valuation charts, PX 51, and applying thereto price-earnings ratios that Overlock accepted as appropriate, the value of that division is between $420 and $544 million. Tr. 1085-86. Applying an average ratio of market price to book value for companies that Goldman Sachs compared to SCM's Pigments, a value of $465 million was obtained. Tr. 1089. Indeed, in addition to Rothschild, two other financial institutions valued Pigments at substantially higher than the options price. Bear Stearns, one of Hanson's deponents, valued Pigments at $420 to 500 million based on Goldman Sachs data. Tr. 766-67; PX 65-69. Kohlberg, Kravis, Roberts & Co., one of the first potential "white knight" leveraged buyout firms that SCM management contacted in August, valued Pigments at about $550 million as part of its consideration as to whether it would make a tender offer for SCM stock. R-43. The lowest of all of these estimates of value, $420 million, suggests a $70 million undervaluation in the optioned price as to Pigments, a differential that would suggest serious undervaluation. See Revlon, 501 A.2d at 1248-1249 (questioning shareholder benefit where, to secure additional $1 per share, Board optioned certain divisions at price $75 million below Revlon's own investment banker's lowest estimate of fair value).[9]
 
 
 45
 Regarding Consumer Foods, Hanson again adduced considerable evidence that the business was optioned at a considerably undervalued price. Simonson from Prudential testified that Borden was interested in buying Consumer Foods for $105 million and that Merrill hoped to get $125 million. Tr. 356-57, 377-80. "Base Case # 10," a document prepared by Merrill and SCM management, placed a July 1, 1986 sale value on Consumer Foods of $100 million. PX 54. On the basis of this document and deposition testimony of representatives of SCM, Merrill, Prudential and Goldman Sachs, a partner at Bear Stearns valued Consumer Foods at approximately $100 million or a range between $90 and 110 million. Tr. 677. Cooper-Mullin from Rothschild noted that "no document was produced in discovery which reflects a valuation or divestiture of the Consumer Foods business at less than $100 million prior to the grant of the Lock-Up Option." PX 74 at 11, p 23. Indeed, Overlock, the principal negotiator for SCM at the negotiations with Merrill regarding the asset options admitted that he had never seen the above-mentioned Base Case # 10 document. Tr. 1115. It is also undisputed that the Goldman Sachs negotiator's first counteroffer to Merrill regarding Consumer Foods was $90 to 95 million.[10]
 
 
 46
 The above evidence notwithstanding, the district court made no findings as to Hanson's claim that the Pigments and Consumer Foods businesses were optioned at prices far below their fair value. Rather, the district court held:
 
 
 47
 Questions involving valuation of particular segments of large companies are precisely the type of questions into which the business judgment rule is designed to preclude courts from inquiring. Courts cannot become mired in valuation issues and should not second-guess directors' decisions on such issues absent a strong showing that the directors somehow breached their fiduciary duties.
 
 
 48
 No such showing has been made in the instant case.
 
 
 49
 Op. at 857. Although the district court conceded that " [t]here are several aspects of the independent directors' actions which trouble the Court," id. at 858, and made clear that its decision "is by no means intended to convey the impression that this Court condones or approves of the actions taken by SCM's board in granting the lock-up options," id. at 858, the court denied Hanson's motion for a preliminary injunction to restrain SCM and Merrill from exercising the lock-up option.
 
 
 50
 We conclude that the district court erred in declining to consider evidence, which the court admittedly found troublesome, which was importantly related to the critical issue of the value of the optioned assets. The court erred in failing to recognize that Hanson had presented a prima facie case of breach of fiduciary duty, and thus should have considered the extensive evidence on whether the option prices were indeed "within the range of fair value." On the crucial issue of valuation, then, the district court presents no findings of fact for us either to uphold or to find clearly erroneous. Appellate courts, of course, are not precluded from inquiring into the evidence in the record when necessary to resolve legal issues. Even where the district court has made specific findings, a reviewing court can overturn those findings when it "is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Because we need not make a specific determination as to value of the optioned assets at this preliminary injunction stage of the proceedings, we do not remand to the District Court to make a finding of valuation. However, we believe that the appellants present evidence sufficient to raise a very serious question that the assets, in terms of what may be the outer parameters of valuation, were significantly undervalued, and that the SCM directors failed in the evidentiary hearings before the district court to present legally sufficient evidence to the contrary, or to otherwise justify their actions. Thus, the district court's legal error in declining to reach the important evidence of valuation does not preclude this court from reversing with directions to grant a preliminary injunction, pursuant to Congress' mandate to us under 28 U.S.C. Sec. 1292(a)(1). See Omega Importing Corp. v. Petri-Kane Camera Company, 451 F.2d 1190, 1197 (2d Cir.1971) (Friendly, C.J.) ("... Congress would scarcely have made orders granting or refusing temporary injunctions an exception to the general requirement of finality as a condition to appealability, 28 U.S.C. Sec. 1292(a)(1), if it intended appellate courts to be mere rubber-stamps save for the rare cases when a district court has misunderstood the law or transcended the bounds of reason"). Accord, Coca-Cola, 690 F.2d at 315.
 
 
 51
 SCM's second attempt at justification is to argue that the purpose of the lock-up option is to achieve a better bid for the shareholders. Primary purpose analysis is undoubtedly a sound theory of lock-up option justification, and is tested in pertinent part according to whether the lock-up option objectively benefits shareholders. Cf. N.Y.Bus.Corp.L. Sec. 717 ("ordinarily prudent person" standard); see also Revlon, 501 A.2d at 1250 ("objective needs of shareholders"); Bennett v. Propp, 41 Del.Ch. 14, 22, 187 A.2d 405, 409 (Del.Sup.1962) (directors may justify stock purchase as "in the corporate interest"); Norlin, 744 F.2d at 265-66. Whatever good intentions the directors might have had, they have pointed to little or no evidence to rebut the evidence discussed above that suggested that they failed to ensure that their acts would redound to the benefit of SCM and its shareholders. Indeed, the district court found that the directors "knew or should have known" that the lock-up option would end the bidding. Op. at 855. The directors thus face the difficult task of justifying a lock-up option that is suspect for foreclosing bidding, see Thompson v. Enstar, Nos. 7641, 7643 and for thereby impinging upon shareholder decisional rights regarding corporate governance, see Norlin, 744 F.2d at 258.
 
 
 52
 Viewing the LBO proposal in its entirety, we cannot see how the deal redounds to the benefit of SCM and its shareholders. For the benefit of an offer superior to Hanson's $72 cash bid by at best one dollar and change, and which arbitrageurs would value at no more than $.75 to $1.00 higher than Hanson's $72 bid, according to Overlock,[11] the board approved immediate release of a $6 million "hello again" fee, and approved management's transfer into escrow of the $9 million "break-up" fee payable upon a third party's acquisition of one-third of SCM's common stock. The Board additionally optioned 50 percent of SCM's operating income from two prime businesses at conceivably well below fair value, according to the abundant evidence before the district court. Cf. Revlon, 501 A.2d at 1249 (noting costs of securing additional $1 per share). Of course, the tendering shareholders would appear to get the benefits but not pay the costs of this arrangement if the LBO were to be consummated and the new entity were a financial success. However, serious questions are presented as to whether the shareholders would be economically harmed by effectively being forced to tender if the lock-up option is not enjoined. Those who do not tender will either become remaining twenty percent holders with appraisal rights which may be valued less because of the lock-up options, and who will be forced out in the second-step of the merger, or, if the requisite two thirds do not tender to Merrill, will be left facing the prospect of the transfer of effectively half the company for inadequate consideration, in addition to the already effected diminution of the corporate treasury resulting from the considerable fees paid by SCM in the course of its defensive tactics.[12] Thus, the SCM-Merrill LBO appears to benefit shareholders, if at all, only so long as it succeeds all the way through the merger stage and the new entity is a financial success. But if the buyout falls short of its ultimate goal, non-tendering shareholders may bear all of the potential risks of an aborted effort, including the risk of significant undervaluation. Indeed, it is the prospect of inadequate consideration that coerces shareholders to tender, and thereby serves as the means by which SCM's managers and directors could wrest from the shareholders the power to make the independent ownership choices that Judge Kaufman saw as the prerogative of shareholders alone, "in accordance with democratic procedures." See Norlin, 744 F.2d at 258.
 
 
 53
 SCM argues that the above concerns notwithstanding, its offer must be upheld as facilitating competition in the market for control of SCM. The argument is flawed because it assumes that a competing bidder is not handicapped by the existence of the option. This is not a case where only in hindsight could the directors have known that the terms of their offer could ultimately harm shareholders. Cf. Thompson v. Enstar, Nos. 7641, 7643 at 9-10. Here, as the district court found, the directors knew or should have known that the lock-up option would foreclose any better offers. Op. at 855. Since the option threatens inadequate consideration, a competing bidder is deterred from making a tender offer, unless conditioned on the withdrawal or invalidation of the subject lock-up, for substantially the same reasons that shareholders are deterred from resisting the SCM-Merrill offer. Both Hanson and other SCM shareholders must be concerned that if the SCM-Merrill deal is consummated through the merger stage, then to be left holding shares is to bear the risk of undervaluation.
 
 
 54
 Indeed, the deterrence to Hanson is even greater than to a small shareholder who does not have or expect to have a blocking position. For, assuming SCM and Merrill achieve a two-thirds majority, the small shareholder most likely risks only being forced to tender under the 20% debenture provision in the SCM-Merrill $74 offer or resorting to appraisal rights. By contrast, hypothetically, Hanson, as the likely largest minority shareholder, holds enough shares to thwart not only the merger but also the 20% freeze-out, and consequently risks holding over one third of a denuded company, a risk that it concededly took in acquiring the additional shares involved in Hanson I. Thus, if the lock-up option is not invalidated, and if it indeed threatens to dissipate the company for inadequate consideration, then Hanson's only rational move is to tender into the SCM-Merrill offer, thereby ending the bidding. In sum, we think the offer forecloses rather than facilitates, competitive bidding. Cf. Thompson v. Enstar, Nos. 7641, 7643.
 
 
 55
 The foregoing compels us to ask the question that the district court failed to consider, but that the court in Revlon wisely raised: "What motivated the directors to end the auction with so little objective improvement?" Revlon, 501 A.2d at 1249. In Revlon, the inescapable conclusion was that the Board seemed to want the LBO partner "in the picture at all costs." Id. 501 A.2d. In the present case, the SCM Board, by its lack of due care, appears to have achieved the same questionable result.
 
 IV
 
 56
 For all the above reasons, we think that Hanson has raised serious questions going to the merits sufficient to make them a fair ground for litigation. We further believe that irreparable injury to the stockholders, including Hanson, is at stake, and that the balance of hardships in this case tips decidedly in Hanson's favor. For if the lock-up option is exercised without completion of the merger, SCM will likely be broken up for inadequate consideration, thus effectively precluding Hanson or any other bidder from seeking to gain control. Once shareholders tender into the SCM-Merrill $74 offer, the company will essentially become privately held, and Hanson would be virtually precluded from seeking to acquire it, short of the virtually inconceivable possibility of judicial valuation and forced sale. It certainly seems "doubtful that any damage claim against the directors can reasonably be a meaningful alternative." Gimbel v. The Signal Companies, 316 A.2d 599, 603 (Del.Ch.), aff'd, 316 A.2d 619 (Del.Sup.1974). This harm is not protected by the business judgment rule, given Hanson's prima facie showing of breach of the duty of due care as discussed above. Further, the mere threat of the exercise of the option, as discussed above, operates to coerce Hanson and other SCM shareholders into tendering for potentially less than optimal consideration, now tangible in the form of Hanson's higher cash offer of $75. Cf. Asarco, Inc. v. M.R.H. Holmes A Court et al., 611 F.Supp. 468, 480 (D.N.J.1985); Applied Digital Data Systems, Inc. v. Milgo Electronic Corp., 425 F.Supp. 1145, 1162 (S.D.N.Y.1977). Further, the consequences portend irreparable harm to Hanson, a substantial shareholder, given the possibility of major structural changes to the corporation, even though SCM will have the $430 million in cash that it receives for the exercise of the option. Another possibility is that Merrill might later sell corporate assets to finance its LBO debt. Cf. Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.1981), cert. denied, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982) (injunctive relief necessary to ensure that "Crown Jewel Option" (oil field) will not be depleted by white knight option grantee). We believe that the market forces can best be permitted to determine the outcome of this contest if the lock-up option is preliminarily enjoined. See Seagram & Son, Inc. v. Abrams, 510 F.Supp. 860, 862 (S.D.N.Y.1981). This remedy, of course, does not preclude SCM from renewing its defensive efforts on other legitimate terms, or on a basis that is beyond challenge, cf. Revlon, 501 A.2d at 1251, a possibility that we view as highly significant in weighing the balance of hardships.
 
 
 57
 The order of the district court is reversed, and the case is remanded for prompt issuance of a preliminary injunction enjoining SCM, Merrill, and any other parties acting in concert with or on behalf of SCM or Merrill from exercising or purporting to or seeking to exercise the lock-up option considered herein. Judgment to be entered in accordance with this opinion.
 
 
 58
 It is so ordered.
 
 OAKES, Circuit Judge (concurring):
 
 59
 Concurring fully in Judge Pierce's opinion and its reference to the shift in the burden of proof, I write solely in partial reply to points made in Judge Kearse's dissent.
 
 
 60
 I do not think that the New York "business judgment" rule as set forth in Auerbach v. Bennett, 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (1979), particularly in the light of the gloss given it by this court in Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255 (2d Cir.1984), goes so far as to immunize directors merely because they act in good faith, without self-dealing. Rather, even though "independent directors" make a decision, they have a duty to exercise due care, a duty which I think the dissent recognizes. Due care requires full inquiry. To obtain the benefit of the business judgment rule, then, directors must make certain that they are fully informed, and, to the extent that they are relying on advisers, that the advisers are fully informed and in turn fully inform the directors. This is particularly true, it seems to me, when the decision is whether to agree to an asset lock-up, which by definition implies making some asset available to the potential buyer at a price less than those assets would bring in an orderly sale, thereby tending to foreclose further bidding for the target company. And this duty of care is, if anything, heightened--it certainly is not weakened--when the favored buyer obtaining the lock-up is a consortium including within it the management/non-independent directors who will have a substantial participation in the future equity of the potential buyer and whose interests by virtue of that participation, at that stage, are to favor the buyout at the lowest price. This directorial duty of care is heightened because management interests are then in direct conflict with those of the shareholders of the target corporation to obtain the highest price either for their shares or for the company's assets. In other words, a management-participation leveraged buyout, when coupled with a lock-up option, calls for close scrutiny of the exercise of care on the part of independent directors to make certain that their collective judgment is informed sufficiently to enable them objectively to weigh the delicate balance of potential gain, if any, to the stockholders from the lock-up, as against possible loss from closing out the bidding or, in the event of a tender-offer standoff, having some of the corporate assets sold at an unconscionably low price. That there was some concern about the possibility of a standoff is evident from SCM's own "exchange offer" made October 10, 1985, in which it proposed to offer $10 in cash and $64 in preferred stock for two-thirds of its outstanding stock, in the event neither the management-Merrill Lynch tender offer nor the Hanson tender offer is completed.
 
 
 61
 In terms of deference to the trial court's findings as to the exercise of due care, I only quote those findings as set forth in its conclusions:
 
 
 62
 The board appears to have given little or no consideration to whether the trigger event for the lock-up option was already satisfied when the option was granted, or how quickly thereafter it might be satisfied. As it turns out, Hanson triggered the lock-up option on September 11, 1985--one day after it was granted. Similarly, the board appears not to have carefully and closely scrutinized the actual superiority of the $74.00 offer (which involved a cash purchase for up to 80 percent of SCM's common stock with the remaining 20 percent being exchanged for "junk bonds"), particularly when coupled with the risk that if the option was triggered and exercised, SCM would be a company without two of its most valuable divisions. The board also failed to read and review carefully Merill [sic ] Lynch's offers, Hanson's various offers, and the lock-up option agreement. They relied instead primarily on their advisors' description of the terms of these agreements and offers. Finally, the board accepted Goldman Sachs' conclusion that the prices of the optioned assets were fair without ever inquiring about the range of fair values. The foregoing is not condoned by this Court. Rather, based on the record before this Court and the current state of the law, these actions do not rise to the level of a breach of the fiduciary obligation owed to SCM and its shareholders by the board.
 
 
 63
 I think these findings show a likelihood of a breach of the duty of due care, at least when coupled with the valuation evidence fully explicated in Judge Pierce's opinion.
 
 
 64
 Finally, when it comes to the standard of review of a district court's grant or denial of a preliminary injunction, while we often use the rubric that there must be a showing of "abuse of discretion," that rubric has no application to a pure question of law--here whether under the New York business judgment rule, so-called independent directors have a duty of due care--and only limited application to the mixed question of law and fact whether there is a likelihood that that duty has been breached in a specific instance. See Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 773 (1982) ("Perhaps the most important area where parroting the discretion phrase is likely to lead to wrong decision is the review of the grant or denial of preliminary injunctions."); National Association of Letter Carriers v. Sombrotto, 449 F.2d 915, 921 (2d Cir.1971) (Friendly, J.); see also Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189, 193 (4th Cir.1977) (Craven, J.) ("When the grant or denial of interim injunctive relief is reviewed, it is simplistic to say or imply, as we sometimes do, that it will be set aside only if an abuse of discretion can be shown.... A judge's discretion is not boundless and must be exercised within the applicable rules of law and equity."), cited with approval in Friendly, supra, 31 Emory L.J. at 777.
 
 
 65
 This is an extremely close case, I have no doubt. It is also an important one since the federal courts seem to attract tender offer cases and the substantive New York law will govern many of them, at least in this circuit. I note parenthetically that this would be, I think, a much easier case for the plaintiffs were Delaware's the governing law, under MacAndrew & Forbes Holdings, Inc. v. Revlon, Inc., 501 A.2d 1239 (Del.Ch.1985), aff'd, Nos. 353 & 354 (Del.Sup. Nov. 1, 1985). In any event, I thought it worth noting these few points in the light of the persuasiveness of the dissent, though I by no means want to detract from the force of Judge Pierce's majority opinion, in which, as I say, I fully concur.
 
 KEARSE, Circuit Judge, dissenting:
 
 66
 With all due respect, I dissent. In my view the majority has paid insufficient attention to (1) the proper standard for review of a district court's denial of a preliminary injunction, (2) the proper standard of review of a district court's findings of fact, and (3) the substance of New York law.
 
 
 67
 The proper standard for appellate review of an order of the district court denying a preliminary injunction is whether or not the denial constituted an abuse of judicial discretion. Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 315 (2d Cir.1982); see also Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975) (granting of preliminary injunction likewise subject to abuse of discretion test on appeal). Normally, to conclude that the district court abused its discretion, the appellate court must find either that the district court applied incorrect legal standards or that its findings of fact are clearly erroneous. See, e.g., Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 54 (2d Cir.1985) ("An abuse of discretion may be found when the district court relies on clearly erroneous findings of fact or on an error of law in [denying] the injunction.").
 
 
 68
 The role of the appellate court in reviewing the factual findings of the district court is substantially circumscribed. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., --- U.S. ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Further, "[w]hen ... the issue involves the credibility of the witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight." Miller v. Fenton, --- U.S. ----, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985).
 
 
 69
 The majority pays little more than lip service to these principles. Instead, it commences its discussion with the statement that this Court is "asked to determine whether SCM's Board of Directors' approval of a lock-up option of substantial corporate assets is protected by the business judgment rule," (ante at 272), and it proceeds to engage in extensive factfinding normally reserved to the district court. And while purporting to apply the business judgment rule, the majority proceeds to engage in extensive exploration of asset valuation of the sort normally reserved to corporate directors.
 
 
 70
 I bypass here, in the interests of expedition, such matters as whether certain of the majority's factual findings have support in the record and whether it is at all appropriate for this Court to direct the granting of a preliminary injunction on the basis of conclusory findings made by the court of appeals on questions of irreparable injury and balance of hardships when the district court has not even reached those questions. I dissent here solely on the basis that application of the proper standards of review and the proper principles of substantive law compels the conclusion that the district court did not abuse its discretion in denying the motion of Hanson Trust PLC, et al. ("Hanson"), for a preliminary injunction against the exercise by a subsidiary of Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") of an option to purchase two businesses owned by SCM Corporation ("SCM"), and that the decision of the district court should therefore be affirmed.
 
 
 71
 A. The District Court Applied Proper Legal Principles.
 
 
 72
 The substantive law governing this action is the law of New York; the predominant principle applicable to the facts before us is the business judgment rule. The New York Court of Appeals has explained that the business judgment rule
 
 
 73
 bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. "Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient." (Pollitz v. Wabash R.R. Co., 207 N.Y. 113, 124, 100 N.E. 721, 724.)
 
 
 74
 * * *
 
 
 75
 * * *
 
 
 76
 It appears to us that the business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments. The authority and responsibilities vested in corporate directors both by statute and decisional law proceed on the assumption that inescapably there can be no available objective standard by which the correctness of every corporate decision may be measured, by the courts or otherwise. Even if that were not the case, by definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility. Thus, absent evidence of bad faith or fraud (of which there is none here) the courts must and properly should respect their determinations.
 
 
 77
 Auerbach v. Bennett, 47 N.Y.2d 619, 629-31, 419 N.Y.S.2d 920, 926-27, 393 N.E.2d 994, 1000-01 (1979).
 
 
 78
 As the New York court's exposition reveals, the district court's first task in determining whether the business judgment rule precludes examination into the correctness of directors' decisions is to consider whether the directors have acted in good faith, without fraud, and without self-interest. As this Court has held, the law presumes that the directors have so acted unless the party challenging their decision can prove to the contrary:
 
 
 79
 "Under the business judgment rule, directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in self-dealing or fraud, or to have acted in bad faith. Once a plaintiff demonstrates that a director had an interest in the transaction at issue, the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation. Daloisio v. Peninsula Land Co., supra, 127 A.2d at 893; Geddes v. Anaconda Copper Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921). Only if the director carries this burden will the transaction be upheld. The initial burden of proving the director's interest or bad faith, however, always rests with the plaintiff."
 
 
 80
 Crouse-Hinds Co. v. InterNorth, Inc., 634 F.2d 690, 702 (2d Cir.1980) (quoting with emphasis Treadway Cos. v. Care Corp., 638 F.2d 357, 382 (2d Cir.1980) ("Treadway")). Accord Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 265 (2d Cir.1984). When the decision at issue relates to a transaction approved by directors who have proceeded honestly and with no self-interest, the burden does not shift to those directors to justify their decisions, and questions of adequacy of consideration are in general to be left to them even if " 'the results show that what they did was unwise or inexpedient.' " Auerbach v. Bennett, 47 N.Y.2d at 629, 419 N.Y.S.2d at 926, 393 N.E.2d at 1000 (quoting Pollitz v. Wabash R.R. Co., 207 N.Y. 113, 124 (1912)).
 
 
 81
 These principles do not give the directors carte blanche to act without some degree of care. As this Court has previously stated, "when courts say that they will not interfere in matters of business judgment, it is [presupposed] that judgment--reasonable diligence--has in fact been exercised." Treadway, 638 F.2d at 384. Thus, if the district court finds that the directors have engaged in no self-dealing, had no conflict of interest, and have not acted in bad faith, it must next determine whether the directors' decisions have been arrived at after an exercise of judgment.
 
 
 82
 In determining whether sufficient judgment has been exercised, the court must apply the principles established under governing law. New York law provides that
 
 
 83
 [i]n performing his duties, a director shall be entitled to rely on information, opinions, reports or statements including financial statements and other data, in each case prepared or presented by ... counsel, public accountants or other persons as to matters which the director believes to be within such person's professional or expert competence....
 
 
 84
 N.Y.Bus.Corp.Law Sec. 717 (McKinney Supp.1984); see Buffalo Forge Co. v. Ogden Corp., 555 F.Supp. 892, 904, 905 (W.D.N.Y.), aff'd, 717 F.2d 757 (2d Cir.), cert. denied, 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983).
 
 
 85
 In the present case, the district court scrupulously adhered to these substantive principles, looking first to see whether the independent directors of SCM ("Directors") had any self-interest, or engaged in fraud, or proceeded in bad faith. Finding, unimpeachably, that they had not (see Part B. below), the court concluded, as required by the above authorities, that the burden did not shift to the Directors to prove that the transactions at issue were reasonable and fair.
 
 
 86
 The court next proceeded, again as required by the above authorities, to the question of whether the Directors had in fact exercised their judgment. Although its opinion intimates that had the court been a director, it would not have been content to rely as heavily on legal and financial advisors as it found the SCM Directors had done, the court recognized that New York law permits such reliance by the directors.
 
 
 87
 I cannot see that the district court in any respect applied erroneous legal standards.
 
 
 88
 B. The Court's Findings of Fact Are Not Clearly Erroneous.
 
 
 89
 Within this substantive legal framework the district court made findings of fact that cannot, under the proper standard of review, be ruled clearly erroneous. Having conducted an eight-day evidentiary hearing during which it "had an opportunity to view and assess the credibility and demeanor of all the witnesses who testified," district court opinion, 623 F.Supp. 848, 855 n. 7, (S.D.N.Y.1985), and basing its factual findings "in large part on th[at] testimony," id., and in part on the moving papers and exhibits submitted by the parties, id. at 850 n. 3, the district court made findings of fact that included the following:
 
 
 90
 (1) The Directors did not take any action out of self-interest, or bad faith, or fraud, or for any other improper purpose.
 
 
 91
 (2) None of the Directors owned significant amounts of SCM stock or received any significant amount of remuneration from SCM; none was affiliated with any entity that did business with SCM or otherwise held a position that would present a conflict of interest for him in his capacity as an SCM director. In short, none of the Directors had any conflict of interest with his fiduciary obligations.
 
 
 92
 (3) At all relevant times during the battle for control of SCM, the firms of Goldman, Sachs & Co. ("Goldman Sachs") and Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), on whom the Directors relied for financial and legal advice, respectively, represented SCM and the board, and did not represent or act on behalf of SCM's management in any manner. Neither firm had any conflict of interest.
 
 
 93
 (4) The Directors knew that regardless of who prevailed in the takeover battle between Hanson and Merrill Lynch, the Directors would have no role in the businesses purchased by Merrill Lynch and would no longer continue to serve on the SCM board.
 
 
 94
 (5) The Directors knew that some members of SCM's management would participate in the resulting company if Merrill Lynch prevailed, but the Directors did not approve the offer in order to entrench management.
 
 
 95
 (6) The Directors were not influenced by management in their consideration of whether to approve the proposed transaction with Merrill Lynch.
 
 
 96
 (7) The Directors relied on Wachtell Lipton and Goldman Sachs to negotiate with Merrill Lynch.
 
 
 97
 (8) The $74 offer, the lock-up option, and the prices of the optioned assets were the result of arm's-length negotiations between Goldman Sachs and Merrill Lynch.
 
 
 98
 (9) In approving the $74 offer from Merrill Lynch and the accompanying lock-up option agreement, the Directors relied in part on the advice of Wachtell Lipton and Goldman Sachs.
 
 
 99
 (10) In advising the Directors, Goldman Sachs did not define the range of value for the assets to be optioned or for the company as a whole. However, it did advise the Directors that, while a higher price might be obtained for these assets if there were more time to seek other buyers, the prices offered by Merrill Lynch for the assets were fair.
 
 
 100
 (11) Each of the Directors had extensive business experience and a thorough working knowledge of SCM, its operations, and its financial condition.
 
 
 101
 (12) In approving the $74 offer and the accompanying lock-up option agreement, the Directors relied not only on their legal and financial advisors but also on their own business experience and their own knowledge of SCM's operations and financial condition.
 
 
 102
 (13) Goldman Sachs and Wachtell Lipton informed the Directors at the September 10 meeting that Merrill Lynch would not make the $74 offer without receiving the lock-up option.
 
 
 103
 (14) Merrill Lynch confirmed that it would not make its $74 offer without receiving the lock-up option.
 
 
 104
 (15) The Directors approved the lock-up option only after concluding that they could not secure the $74 offer without granting the option.
 
 
 105
 (16) At all times the Directors acted from a motivation to secure offers for SCM that would be superior to the offers of Hanson.
 
 
 106
 (17) The Directors approved the $74 offer and the lock-up option not with any desire to end the bidding for SCM but only in an attempt to secure value for SCM's shareholders above the then-current Hanson offer of $72.
 
 
 107
 (18) Hanson's offer of $75 per share on October 8 would not have been forthcoming absent Merrill Lynch's offer of $74 per share approved by the Directors on September 10.
 
 
 108
 The district court found that there was no evidence that the Directors had acted improperly in relying on the advice of Goldman Sachs and Wachtell Lipton, and found that "the nine disinterested directors exercised independent judgment." 623 F.Supp. at 857.
 
 
 109
 These findings were amply supported by the evidence, but the majority accords them no deference. Rather, the majority finds generally that the Directors, though free of any self-interest, fraud, and bad faith, did not exercise "due care" because they relied "baldly" on the recommendations of their financial advisors. In so finding, the majority ignores New York law which, as discussed above, permits directors to rely on such advisors. As demonstrated below, the district court's application of this principle to the record before it to find that the SCM Directors did in fact exercise sufficient judgment should not be overturned because it is supported by the record.
 
 
 110
 The critical focus in this case, of course, is the approval of the optioning of SCM's consumer foods business for $80 million and its pigments business for $350 million. The record shows that the information before the Directors was not so scant as the majority would have it; nor was the reliance of the Directors "bald[ ]." For example, the minutes of the September 10 board of directors meeting reflect that Willard J. Overlock, Jr., the head of Goldman Sachs's mergers and acquisitions department, informed the Directors, inter alia, that the price for the consumer foods business represented a price-earnings ratio of 13.3 times fiscal 1985 earnings and 15.4 times projected 1986 earnings; that the option price for the pigments business was 10.2 times fiscal 1985 earnings and 8 times projected 1986 earnings; and that the price negotiated for each business exceeded book value--for the foods business by 43.6% and for pigments by 25%. He advised that on a per ton basis, "which would be one benchmark though not necessarily the best one," the pigments business would be worth about $310 million. Overlock informed the Directors that the prices were in the range of fair value. As the majority notes, ante at 276, Goldman Sachs had earlier compiled an extensive set of financial data which, while not stating a value or range of values for the pigments and foods businesses, offered quantitative bases for assessing whether the option prices indeed were "within the range of fair value." The majority fails to note, however, that these data had been in the Directors' possession for a week prior to the September 10 meeting, having been given to them at the board's September 3 meeting in connection with Merrill Lynch's earlier $70 offer, as to which the district court found the Directors had refused to grant a lock-up option. At the September 10 meeting, Overlock informed the Directors that while higher prices for these businesses might be obtained in an orderly sale, Goldman Sachs might not, in such a sale, be able to obtain prices at the high end of the range of fair values, and the actual selling prices could be below the option prices.
 
 
 111
 Thus, the record reveals that the Directors were in fact presented with a substantial amount of information as to prices and values of the businesses to be optioned. Nor was the Directors' reliance on the views of their advisors so unquestioning as the majority suggests. The minutes of the September 10 meeting indicate that after the initial description of the proposed deal by SCM's counsel and its investment banker, the directors asked questions as to, inter alia,
 
 
 112
 --the valuation of the Merrill Lynch deal,
 
 
 113
 --the possibility that Hanson would raise its bid,
 
 
 114
 --whether asset options such as that proposed had been legally upheld,
 
 
 115
 --the Goldman Sachs evaluation of the Merrill Lynch deal and the valuation of the debentures,
 
 
 116
 --the possibility of a shareholder suit,
 
 
 117
 --the trigger of the asset option,
 
 
 118
 --what parts of the SCM business Hanson was interested in,
 
 
 119
 --the impact of the proposed deal on the employees of the company,
 
 
 120
 --the continuing viability of the company,
 
 
 121
 --whether a higher price might be obtained for these assets,
 
 
 122
 --what the equity ownership of the new company would be under the new deal, and
 
 
 123
 --whether Merrill Lynch would do the deal without the asset option.
 
 
 124
 The minutes indicate that questions regarding the prices at which the assets were to be sold were asked repeatedly. I find it impossible, given the record supporting the district court's finding that sufficient independent judgment was exercised, to agree that the majority should be allowed to substitute its own finding that the Directors simply did not exercise judgment.
 
 
 125
 The majority finds particular fault with the Directors principally for (1) not having insisted on a price for the foods and pigments businesses that would match the percentage of SCM's income stream produced by those businesses, (2) not having asked Goldman Sachs precisely what a fair range of prices would be for the businesses, (3) not having viewed Merrill Lynch's $74 offer as perhaps only a little better than Hanson's $72 offer, and (4) having approved the proposed assets option after meeting for only three hours on September 10 without, unlike the directors in Treadway, adjourning the meeting for a week to ponder the matter. None of these concerns is appropriate here.
 
 
 126
 As to the majority's suggestion of undue haste, Hanson apparently made the same argument to the district court. That court found that
 
 
 127
 [t]his argument ignores the realities of a heated takeover battle. The directors did not have the luxury of unlimited time; unlimited time either to consider the Merrill Lynch $74.00 offer or to find an alternative buyer for the two optioned assets. See Joy v. North, 692 F.2d 880, 886 (2d Cir.1982), cert. denied, 460 U.S. 1051 [103 S.Ct. 1498, 75 L.Ed.2d 930] (1983) (... business imperatives often call for quick decisions).
 
 
 128
 623 F.Supp. at 858. Given the "realities" reflected in this record, the district court's finding was undoubtedly correct. The record shows, inter alia, that the right of shareholders tendering to Hanson to withdraw those tenders was to expire at midnight on September 16; and that a new bid by Merrill Lynch could cause the extension of that withdrawal deadline but only if the new bid were commenced before midnight on September 16. Because the merger phase of the Merrill Lynch transaction was to involve the issuance of registered debentures, Merrill Lynch would need time between the Directors' approval of the transaction and the date of its bid in order to make the detailed filing with the Securities and Exchange Commission required in order for its offer to commence. Given these facts and the history of the Directors' consideration of the prior Merrill Lynch offer, the finding of the district court that the Directors did not give their September 10 approval in undue haste cannot properly be overturned.
 
 
 129
 As to the majority's valuation concerns, i.e., that the Directors did not insist on a price based on the income-producing role of the two businesses, did not ask Goldman Sachs about the range of values of the businesses, and did not adequately evaluate the superiority of the new Merrill Lynch offer, these are precisely the types of issues that courts are ill-equipped to explore and whose judicial exploration the business judgment rule is designed to preclude. So long as conflict-free directors have in fact exercised their judgment, they are not to be second-guessed as to other valuation bases they might have used or other questions they might have asked. As this Court has stated, where it is clear that the directors have asked a number of questions, the fact " [t]hat the record does not reveal the substance of these questions is of little importance. Once it becomes clear that the directors have exercised their business judgment, they will not be second-guessed by the courts: 'What has been uncovered and the relative weight accorded in evaluating and balancing the several factors and considerations are beyond the scope of judicial concern.' " Treadway, 638 F.2d at 384 n. 52 (quoting Auerbach v. Bennett, 47 N.Y.2d at 634, 419 N.Y.S.2d at 929, 393 N.E.2d at 1003). Here the record showed that the Directors had a significant amount of information to consider and easily permitted the inference that the Directors did in fact exercise their judgment. The district court's decision to draw that inference is entitled to deference; its finding that the Directors sufficiently exercised their independent judgment in the manner permitted by New York law cannot properly be ruled clearly erroneous.
 
 CONCLUSION
 
 130
 In sum, according to the district court's amply supported findings, the Directors had no self-interest, engaged in no fraud or bad faith, and were not improperly influenced by management. The agreement for Merrill Lynch's $74 offer in exchange for the assets option was negotiated at arm's-length by the Directors' legal and financial advisors, who also had no conflict of interest. The Directors at all times acted from a desire to secure offers for SCM and its shareholders that would be superior to the offers of Hanson. Without the $74 offer from Merrill Lynch, the bidding would have died at $72, Hanson's then-current offer. The Directors had extensive business experience and a thorough working knowledge of SCM, its operations, and its financial condition. They relied on their legal and financial advisors. They also relied on their own business experience and their own knowledge of SCM's operations and financial condition. They were informed of, inter alia, at least three bases for the Goldman Sachs conclusion that the option prices were fair--price-earnings ratios, book values, and, with respect to pigments, capacity--and had other data offering quantitative bases for assessing whether the option prices were within the range of fair value. The Directors were informed that a more leisurely sale of these businesses might, but might not, bring higher prices. They asked many questions before approving the transaction. They were informed that Merrill Lynch would not make its $74 offer without receiving the assets option. They "exercised independent judgment."
 
 
 131
 In the circumstances, the district court's decision to deny a preliminary injunction against consummation of the assets option transaction because judicial second-guessing of the Directors' actions was precluded by the business judgment rule was hardly an abuse of discretion. I would affirm that decision.
 
 
 
 [1]
 The Record in this case is enormous, spanning some thirty volumes, and will be cited hereafter as follows: references to the transcript of the preliminary injunction hearing are cited as "Tr. ____"; references to plaintiffs' exhibits are cited as "PX ____"; references to defendants' exhibits are cited as "DX ____"; references to other documents in the Record are cited as "R ____." The transcript appears in Volumes H-K of the Record, and the Exhibits in Volumes L-CC
 
 
 [2]
 Hanson further points out that SCM's management initially retained Goldman Sachs as SCM's "exclusive" financial adviser regarding the Hanson offer, Tr. 1116, and that the head of the negotiating team on the SCM LBO from Prudential Insurance Co., a potential co-financing partner with Merrill, noted in the so-called "Prudential Notebook": "Lipton rep[resentin]g m[ana]g[emen]t," PX 103 at P-003044
 SCM, in response, points out that on August 25 the Board approved retention of Wachtell Lipton and Goldman Sachs to serve "at the pleasure of the board and not the management." Tr. 525; PX 16 at 11. Further, SCM points out that Goldman Sachs has underwritten SCM securities and, in August 1985, conducted a due diligence review of SCM in connection with a contemplated debt offering. Tr. 858-59. Further, SCM also notes that Wachtell Lipton represented SCM in a proxy contest in 1980, and since then has periodically advised the board on developments in the mergers and acquisitions field. Tr. 27-28, 1296-97. The district court noted that both Goldman Sachs and Wachtell Lipton at all relevant times have advised "SCM and the SCM Board." Op. at 852.
 
 
 [3]
 Hanson argues that the transfer of the $9 million break-up fee into escrow, along with the "crown jewels," was wholly unauthorized by the Board. Since Hanson did not seek a preliminary injunction as to the fees, that issue is not properly before this court
 
 
 [4]
 The district court found that the terms of the option provision contemplated the triggering of the option upon a third party's acquisition of one-third of the outstanding shares on a primary, not a fully diluted, basis. It further found that Hanson triggered the option as a result of its stock purchases on September 11, 1985. Op. at 854. Although Hanson contests the district court's finding as to the basis for computing when the option is triggered, we need not reach this issue since we preliminarily hold the option itself invalid
 
 
 [5]
 The minutes of the September 10 Board meeting indicate that Overlock informed the Board that the book value of Consumer Foods was $56 million, that the 1985 and projected 1986 earnings were $6 million and $5.2 million respectively, that the price-earnings ratios for those years were 13.3 times and 15.4 times respectively, and that the option price of $80 million represented 43.6% over book value. PX 27 at 5
 As to Pigments, the minutes indicate that Overlock informed the Board that the book value was $280 million, that 1985 and projected 1986 earnings were $34.4 million and $44 million respectively, that the price-earnings ratios for those years were 10.2 times and 8 times respectively, and that the option price of $350 million represented 25% over book value. Id.
 
 
 [6]
 As a result of its September 11 purchases, Hanson had 3,416,600 shares, representing approximately 33.6% of SCM's shares outstanding on a primary basis. R-60 at paragraphs 3-5. However, SCM argues that because of delays on the part of SCM's transfer agent, the fact of Hanson's triggering the Option was not apparent to SCM until Hanson purchased additional shares on October 2-4
 
 
 [7]
 Specifically, Hanson stated that the offer was conditioned on the return of the optioned businesses and the $9 million break-up fee to SCM from the escrow account. On October 9, Hanson announced that its offer would no longer be conditioned on the return of the $9 million fee to SCM. PX 200 at 16
 
 
 [8]
 It is true that Mr. Cooper-Mullin of Rothschild admitted on cross examination that Rothschild's August 7 Discussion Notes suggests that the value of SCM's titanium dioxide business was approximately $300 million assuming a price of $1,000 per ton. On redirect examination, however, Cooper-Mullin pointed out the distinctions that he was precluded from making on cross examination: the difference between estimating a lowest figure on a capacity basis for an "undistinguished capacity" and valuing a particular entire pigments business. SCM's Dupont technology renders its Pigments business "a lot better than undistinguished capacity," and therefore the value of SCM's titanium dioxide business is likewise "substantially higher" than an undistinguished capacity valued at $1,000 per ton. Tr. 491-92
 Indeed, even the August 7 Discussion Notes suggests valuations consonant with the other evidence. The document offers three valuations: (1) Going concern--$490 million for the entire Chemicals Division; (2) Capacity of the " [titanium dioxide] business alone"--$300 million "minimum value"; and (3) Acquisition price--$568-710 million. The document's conclusion is that the Chemicals Division is worth $490 to 565 million. On this basis, Pigments, which generates 88% of the Chemicals Division income according to Overlock, would be worth approximately $431.2 to 462 million.
 
 
 [9]
 We note that a prima facie showing of lack of due care is distinct from a prima facie showing of corporate waste, which may constitute a cause of action against directors separate and distinct from breach of the duty of loyalty or due care. See Ludlum v. Riverhead Bond & Mortgage Corp., 244 A.D. 113, 278 N.Y.S. 487 (2d Dep't 1935). It might well be that Hanson's evidence was sufficient to establish a prima facie case of waste, even given the considerable burden of proof required under that cause of action. See Cohen v. Ayers, 596 F.2d 733, 739 (7th Cir.1979) (applying New York law) (plaintiff must show that "no reasonable businessman could find that adequate consideration had been supplied"); accord, Aronoff v. Albanese, 85 A.D.2d 3, 5, 446 N.Y.S.2d 368, 371 (2d Dep't 1982) ("The objecting stockholder must demonstrate that no person of ordinary sound business judgment would say that the corporation received fair benefit."). However, we need not reach the issue of waste given the sufficient grounds presented herein in support of a preliminary injunction. See Revlon, 501 A.2d (enjoining lock-up option without specifically noting waste); Data Probe, No. 92138-1983 (same)
 We find unpersuasive the district court's efforts to distinguish Revlon. See Op. at 858. First, although Revlon's fourteen-member board included six directors who held prominent management positions, and while most of the remaining directors had associations with entities that did business with Revlon, Revlon, 501 A.2d at 1243 n. 2, the absence in the present case of such indicia of disloyalty does not limit the likelihood of a breach of the duty of due care. Second, although the hostile bidder in Revlon expressly intended to outbid every offer by the "white knight," id. at 1245, here the district court expressly found that the SCM directors "knew or should have known" that the lock-up would foreclose additional bidding--by Hanson or any other bidder. Op. at 855. Third, while the Revlon court noted that the option price was $75,000,000.00 below the lowest fair value placed upon it by Revlon's own investment banker (Goldman Sachs), Revlon, 501 A.2d at 1249, here the option price of Pigments alone was $70,000,000.00 below the lowest fair value placed upon it in any of the testimony specifying a purported fair value--and this differential represents a greater proportion of the option price than that represented by the differential in Revlon. Finally, while the Revlon board acted to protect note or debtholders instead of shareholders, Revlon, 501 A.2d at 1249-1250, here the SCM board appears to have failed to protect steadfastly shareholders interests in the face of a management-interested LBO, and, through junk bond financing, to have subordinated in significant part the equity of existing SCM shareholders to the future debt of the acquired company.
 
 
 [10]
 $420 million, which the evidence suggests may represent the low end of the range of fair value for Pigments, is 20% higher than the $350 million option price. This differential is greater than the percent differential between $600 million, the apparently lowest material valuation of Revlon's health aids divisions, and $525 million, the option price therefor. See Revlon, 501 A.2d at 1245, 1249. $90 million, the lowest value for Consumer Foods adduced in Hanson's evidence, is 12 1/2% above the option price. Significantly, the Bear Stearns partner stated that although he could understand how one could conceivably value Consumer Foods at $80 million, he could not "conceive of the basis at which someone arrives at 350" million dollars for Pigments. Tr. 767-68
 
 
 [11]
 According to Overlock, arbitrageurs, who are among the most sophisticated investors, would value the $74 LBO offer at about $72.50 in view of not just the cost of money but the "risk" involved in connection with the use of the "junk bonds." Tr. 1180-81. Precisely what risk or risks he was referring to was not developed in the record, although such risk or risks might involve the collapse of the "junk bond" market or the failure of the new corporate entity due to an unserviceable debt resulting from the LBO. According to Overlock, arbitrageurs would also value Hanson's $72 cash offer between $71.50 and $71.75. Tr. 1181
 
 
 [12]
 The $16.5 million in fees to Merrill represents a diminution in value equal to approximately $1.25 per share if the $74 LBO does not succeed